No. 14,353.

STATE OF LOUISIANA VS. THE AMERICAN SUGAR REFINING COMPANY.

SYLLABUS.

1. In order that there should be res judicata, the thing demanded and the cause of action must be the same; and they are not the same in two suits for the licenses of different years.

2. In a suit under a statute imposing a license on refiners of sugar *eo nomine,* the defense being that a refiner of sugar is a manufacturer and as such exempt from license taxation, and that as a consequence the statute imposing the license is inconsistent with the Constitution, and there being no question as to what constitutes a refiner of sugar, the process of refining sugar being the same in all refineries, the sole matter involved is the ascertainment of the meaning of the word manufacturer as used by the Constitution; that is to say, a matter of interpretation of the Constitution—a question purely of law.

3. A sugar refiner is a manufacturer, and as such exempt from license taxation under the Constitution.

APPEAL from the Civil District Court for the Parish of Orleans—
St. Paul, J.

*Hugh C. Cage,* for Plaintiff, Appellee.

*Carroll & Carroll* and *Foster, Milling, Godchaux & Sanders,* for Defendant, Appellant.

The opinion of the Court was delivered by

PROVOSTY, J.  This is a suit by the State of Louisiana through its tax collector, to recover of the defendant, the American Sugar Refining Company, a license tax of $6,250 for each of the years 1900 and 1901, under Section 11, Act 171 of 1898.  The allegation is that defendant is engaged in the business of refining sugar in the City of New Orleans, and that its gross receipts from said business for each of the said years exceeded $2,500,000, and that defendant owes the said license.

For answer the defendant pleaded tthat its business of refining sugar was a manufacturing business, and that defendant, being a manufacturer, was exempt from license taxation by the terms of article 229 of the Constitution of the State.

To this the plaintiff filed a formal plea of *res adjudicata,* based on a former suit, wherein the licenses for 1898 and previous years had been claimed and the same defense of exemption from taxation had been urged.

That suit was based on section 9 of Act 150 of 1890, and the present suit is based on section 11 of Act 171 of 1898; but these two laws are virtually the same, the latter being substantially a re-enactment of the former.

The process used by defendant in its business of refining sugar, as shown on the trial of the former suit, has not changed.

Two questions, therefore, are presented for decision:' First, the preliminary question of *res judicata;* and in case that question is decided adversely to plaintiff, then, second, whether defendant is a manufacturer.

The law of *res judicata* is stated with great simplicity and precision by Article 2286 Civil Code, as follows:

"The authority of the thing adjudged takes place only with respect to what was the object of the judgment. The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be between the same parties, and formed by them against each other in the same qualities."

This formula was borrowed by our Code from the Code Napoleon, Article 1351; by the Code Napoleon from Pothier, Obligations No. 889; and by Pothier from the Roman Jurisconsults. It brings out with great distinctness the salient feature of the law of *res judicata,* namely: The identity that must exist as to thing demanded, cause of action and persons in the two suits. *"Quae nisi omnia concurrant alia res est,"* say the Roman Jurisconsults. Cod. L. 12, L. 13, L. 14, ff de except. rei jud. "Ce n'est que du concours simultané de tous ces elements que peut résulter l'autorité de la chose jugée. En l'absence de l'un d'entre eux, on ne saurait, sans violer la loi, écarter une instance nouvelle par l'exception de la chose jugée," says Dalloz, No. 103, Répertoire de Législation, Vo. Chose Jugée, voicing the unani-

mous sentiment of the courts and writers of France. And to the same effect are our own decisions.

"The exception of the thing adjudged is *stricti juris,* and if there should be any doubt as to the identity of the things claimed, or of the persons claiming them, it cannot be maintained." West vs. Creditors, 3 Ann. 529.

"The plea of *res adjudicata* is without force, unless the object demanded in the former suit was precisely the same as that demanded in the action pending." Edwards vs. Ballard, 14 Ann. 362.

"The only test as to the effect of a decree is its finality as to the matters embraced in it, and its having the requisites of Article 2265 (2286) of the Civil Code." Kellum vs. Rippey, 3 Ann. 203.

"The authority of *res adjudicata* takes place only with respect to what was the object of the judgment." Succession of Durnford, 1 Ann. 92.

See also First Presbyterian Church vs. New Orleans, 30 Ann. 259; Slocomb vs. Lizzardi, 21 Ann. 355; Collens vs. Jumel, 30 Ann. 861; Carre vs. New Orleans, 41 Ann. 996; Plique vs. Lebeau, 19 Ann. 327, and innumerable other cases. Our court has never wavered, that we know of, in the rigid exaction of the three identities.

The learned counsel who has fought the battle of the State in this matter with such commendable zeal and such signal ability does not himself doubt the necessity of the three identities, but insists that they are met with in the case. Says he:—

"The rule seems universal that where any question is litigated "between the parties, affirmed on one side, denied on the other, and "finally determined by the judgment of a court of competent jurisdic- "tion, that particular question or matter is forever at rest between the "respective parties and their privies.

"Suppose that a mortgage note of $10,000 were given, with interest "at six per cent., payable annually for ten years, and that a suit was "brought for the first year's installment of interest, and payment was "resisted on the ground that the note was obtained by fraud and there "was no consideration therefor, and that this defense was overruled by "the court and declared to be ill-founded, and the court should find "and declare that the note was obtained in good faith and that full "consideration was given therefor, and render judgment accordingly; "and then, the following year, suit was brought to recover the second

"year's interest, and the same identical defense was set up, can it be
"possible that any one would, for a moment, contend that the plea of
"*res adjudicata* would not avail plaintiff? There can be no doubt of it.
"The doctrine of *res judicata* and the provisions of our Code are in-
"tended to apply to just such cases.

　"In the present case, the contention is that *res judicata* does not
"apply because the license sued for is that of a subsequent year. The
"parties are the same; the cause of action is the same; the demand is
"the same; and the defense is the identical one that was pleaded in the
"former suit. The defendant alleges, as its sole defense, that it is a
"manufacturer and therefore exempt from license taxation. The
"State denies that it is a manufacturer, alleges that it is not a manu-
"facturer, and that it is liable to license taxation. This issue was
"distinctly asserted, distinctly denied, hotly and strenuously litigated
"and argued, and positively and absolutely decided in favor of the
"State and against the defendant. As between the State and this
"defendant, this question is forever at rest, and can never again be
"litigated between them."

　The learned counsel is right in saying that the defence is the same,
and that the parties are the same, but he is wrong in saying that the
thing demanded and the cause of action are the same. The thing
demanded in the first suit was a certain sum of money which has been
paid and which is neither being demanded a second time, nor sought
to be recovered back.

　The cause of action in a suit for the recovery of a license is the
indebtedness of the defendant, springing from the joint operation of
the statute imposing the license and of the act of the defendant in
carrying on the licensed business. In two suits for the recovery of
the licenses of different years the statute imposing the license may be
said to be the same in the two suits, but the act of the defendant by
which the debt for the license is incurred is each year a separate,
independent, act, similar to but not the same as the act by which the
debt of the license of the preceding year was incurred. At the begin-
ning of each year it is entirely optional with the defendant to do
business and incur the debt of the license of the year, or not to do
business and not incur the debt of the license. Just as much so as
it is optional with a man not to commit assault and battery, or not to
trespass, or do any other act from the joint operation of which and of

the law a debt will arise. In the latter class of cases, equally as in the case of a debt for a license, the debt, or cause of action, comes into existence by the joint operation of the law and of the act of the defendant. In successive suits for cases of this kind one of the causes generative of the cause of action, namely: the law, is the same; but the other generative cause, namely: the act of the defendant, is different; and *res judicata* does not obtain.

It is undeniable that the issue as to whether or not defendant is a manufacturer does occur in both cases, but this issue, as we shall show presently, involves only a question of law, and there can be no objection to litigating a second time a question of law, provided the litigation is in connection with different facts; and we have shown that the act of the defendant in carrying on business in the years 1900 and 1901 was a separate and independent act from the similar act of carrying on business in the preceding years, and that the debts or causes of action arising from the different acts were separate and distinct causes of action. In the cases supposed of repeated assault and batteries and trespasses under circumstances precisely similar, if in every succeeding case the same defence of the unconstitutionality of the law imposing a legal obligation in such cases were set up, *res judicata* would not obtain. The same legal question would be mooted between the same parties, but in connection with facts distinct, separate and independent, though closely similar.

The basic principle of *res judicata* is found in the necessity that a time should come when the litigation shall cease, in order that the decree of the court may be carried out. This is what the law concerns itself with, that the object of the judgment shall not remain eternally in suspense, but be delivered into the quiet and undisturbed possession of the successful litigant. This is what the code means when it says that "The authority of the thing adjudged takes place "only with respect to what was the object of the judgment." The law by virtue of which the object of the judgment is delivered is no part of the object of the judgment. It is only one of the reasons for judgment, and *res judicata* does not take place with respect to the reasons for judgment, but "only with respect to what was the object of judgment." *Res judicata* deals, if we may so express ourselves, with the decree of the court as contradistinguished from the judgment of the court. To give it a wider scope than this is to confound it

with *stare decisis*. The office and function and utility of *res judicata* is not to settle law questions, but to lend stability to a decree, in order that such decree may have effect. If the second suit leaves the successful litigant in the first suit in the undisturbed possession of the thing decreed to be delivered in the first suit, there is no ground for *res judicata*. The thing demanded is not then the same.

This is well illustrated by the case of Collins vs. Jumel, 30 An. 861. There an officer brought suit for that part of his salary accrued up to the time of filing suit, and brought subsequently a second suit for that part of the salary accrued thereafter, and was met. in both suits with the defense that the office had been abolished and that no salary was due. The court held that the part of the salary sought to be recovered in the first suit was not included in the demand of the second suit, and that there was not identity of thing demanded.

The illustration adduced by counsel, of two suits on the several installments of interest on a note, supposes an impossible case. The interest is but the accessory of the note, and cannot form the basis of a demand independently of the note. Both suits would, therefore, have to be on the note. The cause of action would be the same in both suits, namely, the debt on the note. Immediate payment of the capital would not be demanded, but its recognition as a debt would necessarily constitute the main demand of the suit. Interest would follow as a mere consequence. The only issue that could be raised in the first suit distinctively in connection with the first installment of interest, would be payment, or non-accretion of the interest for want of lapse of the required time; and the adjudication of these issues would not be *res judicata* of the same issues when raised in connection with the second installment of interest. That the first installment of interest had been paid or had not yet accrued when sued for would furnish no ground for argument *pro* and *con* the second installment of interest when it, in its turn, came to be sued for.

We said we would show that the issue as to whether defendant is a manufacturer, is not an issue of fact, but of pure law. It will conduce to the clearness of the discussion if we change the form in which counsel has stated this issue. It is not as to whether defendant is a manufacturer, but as to whether a refiner of sugar is exempt or not from license taxation. The statute, in imposing the license, has used a specific term of definite meaning, applicable to defendant's class

and to no other class, namely, the term "refiner of sugar;" and the Constitution, on the other hand, in granting the exemption from taxation, has used a generic term of indeterminate meaning, namely, the term manufacturer, which may or may not be applicable to defendant's class. Hence the controversy. Defendant claims that the statute is inconsistent with the Constitution, and plaintiff insists that it is not. The controversy involves a comparison between the meanings of the specific term "sugar refiner" and of the generic term "manufacturer," made use of by the statute and the Constitution respectively. There would be no controversy if only the Constitution had used a term of unmistakable meaning. If, for instance, in granting the exemption it had, after the example of the statute, used specific terms. Refiners of sugar would then have been unmistakably either included in or excluded from the exemption, and there would have been no controversy. From all this it is plain that the issue is as to the consistency of the statute with the Constitution, and that the determination of that issue depends upon the proper construction to be placed on the verbiage of the Constitution. In the formula made use of by the counsel, namely, whether defendant is a manufacturer, there is implied that the enquiry involves not alone the ascertainment of what the word manufacturer means, but also the ascertainment of what defendant is. Of course, the latter branch of the enquiry would involve a question of pure fact. But the learned counsel does not purpose to imply that there is any difference of opinion as to defendant's being a refiner of sugar, nor as to what constitutes a refiner of sugar. The issue must, therefore, be stated so as to leave out the implication of uncertainty concerning what defendant is; and the formula made use of by us excludes this implication. Except in this respect, it changes in no wise the issue as stated by counsel. In other words, we know that defendant is a refiner of sugar and we know what constitutes a refiner of sugar, but we do not know exactly what the word manufacturer, used by the Constitution, means, and the matter involved is the ascertainment of the meaning of this word, that is to say, of the Constitution. The matter involved is the interpretation of the Constitution—a matter of pure law.

To illustrate his contention that the issue in question involves a question of fact, the learned counsel representing the State adduces the following:

"Suppose the law had imposed a license tax of two dollars upon "each and every *horse* in the State, but that the Constitution had "exempted from license every *thoroughbred stallion*.

"When this license was resisted by a taxpayer, on the allegation "that his horse was a *'thoroughbred stallion,'* met by the contention "on the part of the State that the animal in question was a *common* "*gelding,* would the issue raised, and to be determined by the court, "be one of fact or of law?

"The question answers itself. Proof would have to be adminis- "tered, and thereon the court would have to determine, as a matter of "fact, that the animal was a thoroughbred stallion, or that he was "not an animal of that description. And however the court should "decide, would not the judgment be *res judicata* as between the tax- "payer and the State in a subsequent suit for the tax of a subsequent "year? Plainly it would."

This illustration would be apposite if in our case, as in it, the point to be ascertained was the characteristics of the object taxed; or if in it, as in our case, the issue involved nothing more than a comparison between the popular meanings of two terms, as for instance between the popular meanings of the terms "common gelding" and "thorough- bred stallion."

There is not in the case of Heroman vs. Institute, 34 An. 805, any- thing conflicting with what we have said in this opinion. In that case a lot of ground belonging to the Heroman minors was seized and sold under executory process; and, after the sale, was sold by the purchaser to the same minors and their mother, they giving their notes for the purchase price, secured by mortgage on the property. Afterwards suit was instituted on the notes, and the minors and the mother made defense that the notes were without consideration and null, because the original sale under executory process was null, and as a consequence they themselves were the owners of the property at the time that they purchased it and gave their notes for it. There was judgment rejecting this defense and enforcing the notes. To sat- isfy the judgment the property was sold. Then the minors brought suit to recover the property on the same grounds urged in defense to the notes, namely, the nullity of the original sale under the executory process.

The court found that this issue had been passed on in the defense

to the notes, and was, therefore, *res judicata*. The decision was on rehearing, and Justice Poche, who had been the organ of the court in the original decision, dissented, and Justice Levy, who had concurred in the original decision, took no part in the rehearing, on account of absence. The case is a close one, but may doubtless be justified on the theory that the notes stood for the property in the hands of the vendor and that to demand their nullity was to demand the nullity of the title of the vendor. The effect of the judgment in both cases would have been the same, that is, to give the property to the Heroman minors.

In McKneely vs. Hyde, 46 An. 1083, the matter involved was the validity of a Spanish grant, which had been already passed on in a suit between the authors of the parties to the suit. It was the old demand over again.

In Sewell vs. Scott, 35 An. 553, the matter involved in the two suits was identically the same, the right of one of the parties to a certain trade mark.

In the case of City of New Orleans vs. Citizens' Bank, 167 U. S. 372, the court conceded that two suits for the taxes of different years contained different demands; but held that the authority of the thing adjudged took place nevertheless. The conclusion is in conflict with the provision of the Code by which the thing demanded and the cause of action, that is, the demand, must be the same; and something must be wrong with the reasoning of the court by which the conclusion is reached. Right or wrong, this court would be bound by the code; but on the authority of pure reason, the code is presumably right. The decided weight of authority is on its side. In our humble opinion, the fallacy in the reasoning of the court consists in erroneously supposing that difference of demand in the two suits is compatible with identity of circumstances and conditions in the two suits. The demand of a suit not only is a circumstance and condition in the suit, but is a controlling circumstance and condition. If it is different in the two suits, the question cannot be said to come up in the two suits under identical circumstances and conditions. The pertinent part of the reasoning of the court is as follows:

"In considering the question, we separate at once these two con-"flicting contentions and examine first the proposition that because

"a tax of one year is a different demand from the tax of a subsequent
"year, therefore, *res judicata* as to one can never apply as to the other."

    *         *         *         *         *         *

"The proposition that because a suit for a tax of one year is a dif-
"ferent demand from the suit for a tax for another, therefore, *res ju-
"dicata* cannot apply, whilst admitting in form the principle of the
"thing adjudged, in reality substantially denies and destroys it. The
"estoppel resulting from the thing adjudged does not depend upon
"whether there is the same demand in both cases, but exists, even
"although there be different demands, when the question upon which
"the recovery of the second demand depends has under identical cir-
"cumstances and conditions been previously concluded by a judgment
"betweeen the parties or their privies. This is the elemental rule,
"stated in the textbooks and enforced by many decisions of this court."

The court is perfectly right in saying that "The estoppel resulting
from the thing adjudged * * * exists * * * when the ques-
tion upon which the recovery of the second demand depends has under
identical circumstances and conditions been previously concluded by
judgment between the parties or their privies." But the court, in our
humble opinion, is in error in supposing that it is possible for the
question to come up under identical circumstances and conditions in
two suits whereof the demands are different. Unless the same thing
is being demanded and on the same ground, and the demand is being
resisted on the same ground of defense, there are not "identical cir-
cumstances and conditions" in the two suits. There may be close
similarity. The demands for taxes for different years may be as near
alike as two peas, but they are not identical. The identity would
be in the defense, but the defense is only a reason for judgment, and
forms no part of the judgment. A different judgment might be ren-
dered on it in the second suit, and the full validity, force and effect
of the judgment in the first suit remain unimpaired. The thing ad-
judged takes place only with respect to what forms the object of the
judgment; and where the defendant contents himself with resisting
the demand of the plaintiff, no matter on what ground, the object
of the judgment continues to be the demand of the plaintiff. That
particular demand, whether allowed or rejected, can never again be
urged, but the facts of its allowance or rejection, no matter on what
ground, cannot preclude the bringing forward of another and dis-

tinct demand, no matter how closely similar. If I break my neighbor's fence, and to his suit for damages I plead the non-existence of any law subjecting me to pecuniary liability in such a case, and the day after being cast in the suit I break the fence again under circumstances exactly similar, and another suit ensues, there will be as close identity between the two suits as between two suits for the taxes of different years; but we imagine no one would think of applying the law of *res judicata* to the second suit. If, however, in the first suit, instead of confining myself to denial of plaintiff's claim, I set up an independent right justifying my conduct, as that I am owner of the fence in question, or that I have by contract the right to break said fence, then, as a matter of course, as to this defense, if again set up in the second suit, there would be *res judicata;* but the reason would be that, while urged as a defense, this claim of right would in reality be a demand brought by way of reconvention. I should *pro hac vice* have ceased to be defendant and become plaintiff; and the necessary feature of identity of demand in the two suits would be presented. Exactly when and under what circumstances the defense to a suit passes from the stage of negation and enters upon that of affirmance, so as to constitute a new demand injected into the suit by way of reconvention, it is not always easy to tell. Whether the decision of this Citizens' Bank case can be justified, even on the ground that, in enforcement of its charter contract, the bank had set up a counter demand, we doubt very much. In the case of Mercantile Bank vs. Lander, 109 Fed. 21, the case is sought to be distinguished on that ground from the cases at common law—having largely the preponderance of authority on their side—holding that a suit for taxes of one year is no bar to a suit for taxes of another year. But the case, if reconciled to principle on that ground, ceases to be applicable to the facts of the instant case. Here is no attempt to demand anything of, or to enforce anything against the State, but a mere passive resistance, a denial of the existence of the law on which the claim of the plaintiff is predicated, a challenge of the constitutionality of a law, and nothing more.

Extract from the brief of counsel for defendant:

"If that former decision is *res judicata* as to defendant in this "suit, it is, of course, *res judicata* for all time to come, for the plea of "*res judicata* is a complete bar.

"Now, if to-morrow this court were, in a suit between other parties, "to reverse the law of the 51st Annual case, and hold that a sugar "refiner is a manufacturer, and that the act taxing sugar refiners for "a license is unconstitutional as being contrary to Art. 229 of the Con- "stitution, what would be the situation? All other sugar refiners would "be exempt, yet this defendant would be annually liable for a tax "under an adjudged unconstitutional law, without possibility of relief "from any court, for *res judicata* would forbid this particular sugar "refiner to say that the law is unconstitutional! The tax must be paid, "though the law itself cease to exist!

"Still assuming that, in the supposed case between other parties, "this court should reverse the point of law decided in the former suit "in the 51st Annual and hold that a sugar refiner is a manufacturer, "let us examine the effect upon this defendant. Such a decision would "either not relieve defendant of future taxes or would relieve it of "such taxes.

"(1)  If the decision in the 51st Annual be *res judicata* as between "the State and this defendant, then the supposed contrary "decision in the suit between other parties would not in the "slightest degree affect the relations between the State and "this defendant, and the plea of *res adjudicata* would be as "valid in favor of the State and against this defendant in any future "suit involving the same abstract question of law as it is in the case at "bar. We would then have the absurd condition of the State con- "tinuing to collect a license tax from this defendant under an uncon- "stitutional law; the tax against this particular sugar refiner would "continue even after the very foundation upon which is based the "State's right to claim the tax had been swept away and utterly de- "stroyed! Nor would the courts have power to relieve, for if the judg- "ment in the 51st Annual be *res judicata* now, it will continue to be "such for all time to come.

"(2)  On the other hand, if the contrary decision in the supposed "suit between other parties would have the effect of relieving this "defendant from payment of license taxes to the State for future "years thereafter, then it is plain that *res judicata* does not apply to "this suit, for if such principle do apply, no decision in a suit between "other parties could possibly affect the force of the plea as between "the parties to the suit which is claimed as the bar.

State vs. Sugar Refining Co.

"Choose, then, either horn of the above dilemma and we are brought "to the same inevitable conclusion that the decision in the 51st Annual. "case on the abstract proposition of law there announced is not *res* "*judicata* in the case at bar. For in the first case, if the estoppel be: "applied, the result would shock the conscience and be grossly con- "trary to every principle of right, justice and equality; and, in the· "second case, the conclusion is necessarily that the former decision "is not *res judicata* because it is capable of being affected by a sub-· "sequent contrary decision in a suit between other parties.

"This by no means impossible actual result of upholding such a plea "in this case, shows plainly that it would be radical error to apply "it here. The prior decision was a question arising under a general "law applicable to all alike, and no abstract law point there decided "can ever be more binding on the parties than on others."

We conclude that the plea of *res judicata* is not well founded, and we pass to the second question in the suit—as to whether a sugar· refiner is a manufacturer.

The Constitution provides as follows:

"Art. 229. The General Assembly may levy a license tax, and in. "such case shall graduate the amount of such tax to be collected from "the persons pursuing the several trades, professions, vocations and "callings. All persons, associations of persons and corporations pur-· "suing any trade, profession, business or calling, may be rendered "liable to such tax, except clerks, laborers, clergymen, school teachers, "those engaged in mechanical, agricultural, horticultural and mining· "pursuits, and manufacturers, other than those of distilled, alcoholic "or malt liquors, tobacco, cigars and cotton seed oil. No political "corporation shall impose a greater license tax than is imposed by· "the General Assembly for State purposes. This restriction shall not. "apply to dealers in distilled, alcoholic or malt liquors.

"The General Assembly shall have authority to provide that munici- "palities levying license taxes equal in amount to those levied by police "juries for parochial purposes, shall be exempt from the payment of" "such parochial licenses."

The process used by defendant is undisputed; it is as follows:

The raw sugars, cane and beet, upon being received, are first melted' in vessels specially constructed and adapted for that purpose, called"

"melters." The raw sugars, whatever the grade, are subjected to this process, and without it there can be no refining.

The melted sugar is pumped to the topmost floor of the refinery to other vessels, called "blow-ups." Here suitable chemical agents are introduced into the liquid, the effect of which is to coagulate the impurities in the mass, and, by such coagulation, render more effective the succeeding process of filtering through bags. In these blow-ups the liquid is brought to the proper density and degree of temperature by the introduction of steam sufficient to accomplish the purpose.

From the blow-ups, the liquid is passed into bag filters, entering at the open end and filtering through the folded cloth; the result of this first filtration is to remove from the liquid mass much of the dirt and foreign matter—the insoluble mechanical impurities. These filter bags are from time to time washed and pressed in the "scum-press," the result being to save the sugar adhering to them, and in the dirt, and to remove the dirt from the bags, so that they may be again used. The record shows that the defendant company procures of this refuse as much as 12 to 15 tons a day in the refining operations of its New Orleans refinery.

After the bag filtration, the clarified and partially filtered liquid is next filtered through bone-black filters. These are large metal retorts, almost filled with powdered animal bone-black, which decolorizes and purifies by taking up from the liquid mass the salts and impurities, soluble and free, which have resisted the process of bag filtration. From the bone-black filters, the sugar solution comes clear as crystal.

The by-process of renovating and revivifying the bone-black—an expensive item in the refining process—is accomplished by burning out as much as possible of the impurities and foreign matter which the bone-black has taken up. This is done in the kilns designed for that purpose. Notwithstanding this revivifying process, the bone-black gradually becomes ineffective for filtering purposes, and fresh bone-black must be added from time to time to keep the mass up to the required standard.

The next direct step in refining proper is the re-crystallization of the now purified solution. From the bone-black filters, the liquid is passed into closed copper vessels on pans, and is there boiled in a vacuum, in the vessels which are known as "vacuum pans," or "finishing pans."

In the boiling, the grain of sugar is formed from the liquid mass and is built up by the sugar boiler in charge of the operation, by the exercise of most expert skill and judgment, until it has reached the size, large or small, which is proper for the particular kind of refined product designed to be produced, as the different kinds of ultimate product turned out require different sized crystals.

When the grain has been built up to the desired size, the entire contents of the "finishing pan" are liberated and passed into the centrifugal machines, which is technically called "making a strike." This mixed mass of grained and ungrained sugar is called "magma."

The centrifugal machine is cylindrical in shape, and the magma is introduced within it. The machine is then revolved rapdly— perhaps a thousand revolutions a minute—and the liquid of the magma is forced by centrifugal action through the screen-like lining of the machine and separated from the grained sugar, which is left within the machine.

The liquid so thrown off is carried back and again subjected to the boiling process in the vacuum pan until all the sugar in it which can be economically crystallized out has been obtained from it. The remaining uncrystallizable liquid, which contains too much of impurity to justify the saving of the sugar in it, comes out commercially as molasses.

. Going back to the grained sugar left in the centrifugal, we find a mass of absolutely white grained sugar, not yet, however, thoroughly dried.

Thereafter, the treatment differs according to the ultimate products to be produced. These products are, in this refinery, four in number:

1. "*Cube sugar*" is made by taking the sugar as it comes from the centrifugal machine and pressing it in molds by hot air pressure in the cube machine. The cubes are thereafter further dried in ovens, which process completes the extraction of moisture, and they are then ready for packing as a finished product.

(2) "*Confectioner's 'A' sugar*" is a kind designed to supply a particular trade and use. The grain of this product is designedly formed larger in the finishing pan than the grain for other products, the process up to and including the centrifugaling being otherwise the same. After machining in the centrifugal, this product is ready for the market. The percentage of moisture is greater than in the other

final products, as no further drying process is applied; otherwise, its purity is the same as in the other products.

(3) *"Granulated sugar"* is made by passing the grained sugar from the centrifugal into a revolving drum or cylinder, called a "granulator," into which hot air is introduced. The result is the removal of all moisture and the polishing of the grain by friction, thereby giving it a bright and sparkling appearance. The granulator is also provided with a sifting appliance, whereby uniformity in the size of the grain of the final product is attained.

(4) *"Powdered sugar"* is used particularly for crystallizing fruits, table use, etc. The granulated sugar is introduced into the pulverizing machine, which consists of a series of discs; these are revolved with great rapidity, with the result of reducing the crystals to a fine, dust-like powder.

(5) To these products may be added the *"molasses,"* produced from the liquid thrown off by the centrifugal machine, and hereinbefore mentioned.

(6) To these products may be added again the scum, or filth, for which no commercial use has yet been found. The quantity of this refuse varies with the quality of the raw material, reaching as high as fifteen tons a day, as above stated.

Another by-process of some magnitude, which enters largely into the economy of refining, is the process of evaporating the "sweet water"—the washings from the bag filters, containing more or less sugar in solution. The apparatus is called a "Lily evaporator," and accomplishes the result of economically evaporating the surplus water from the liquid, whereby the latter is brought to the proper degree of density for being put through the successive refining steps of clarification, bag filtration, bone-black filtration, crystallization in the vacuum pan, machining in the centrifugal, and then, according to the particular kind of product desired to be produced.

The raw sugars, whatever their grade or test, are necessarily subjected to the same process. The melting of the sugar, its purification in liquid form and subsequent recrystallization, are the essentials of all refining operations, and have ever been so, though different methods of detail in the accomplishment of the final results have been in the past and are now practiced. The process in general use to-day is more complicated than formerly used, and a better result

is obtained, but the underlying principles are the same. The final refined product of to-day contains less than one-tenth of one per cent (.001) of impurities. The extended uses to which the refined product is put are detailed in the record and are matters of common and judicial knowledge. Most of the product is obtained from raw sugars unfit for use in the crude state.

The process here detailed is in all its essentials the same that is used by all sugar refineries, and, in fact, that has ever been used; these essentials being the melting of the sugar, its purification in the liquid form and its subsequent recrystallization.

Of the $20,451,933.39 of sugar produced by defendant from January 1st, 1900, to December the 31st, 1900, only $2,216,989.58 was so produced from sugar fit for consumption. The rest was from sugar of so low a grade as not to be fit for use in the crude state. Of one of these, the "raw Cuban sugar," the witness Witherspoon says: "That is exhibit Sample No. 11, and sugar in that condition never goes into consumption; in fact, if you would extract the cork here and smell it, the smell would bear out that statement; you can take and open that bottle, and it will perfume the whole room." But whatever the grade of the sugar, the process is the same. No refining is possible, except by reducing to a liquid form and purifying in that form and recrystallizing into sugar.

The defendant uses extensive and complicated machinery, of which views and photographs are brought up as part of the record; employs five hundred to six hundred laborers, skilled and unskilled; uses about seventy-five thousand tons of coal a year; its refinery has about seven hundred thousand square feet of space. Defendant pays State and city taxes on a property assessment of $2,650,500.00.

Thus it is seen that defendant employs vast and varied machinery, with skilled and unskilled labor, and that the refining processes necessarily require many changes in the form and quality of the raw material used in producing the refined article.

On a former occasion, in the case pleaded as *res judicata*, reported in 51 An., at page 562, we were called upon to consider whether these varied processes, carried on on this large scale, and bringing about the many changes in the material operated upon, constituted a manufacturing process and made defendant a manufacturer within the meaning of the provision of the Constitution exempting manufacturers

from taxation, and we came to the conclusion that they did not. On that occasion we gave our views in an elaborate opinion, which, as we thought, fully justified our conclusion. These views are substantially summed up in the following excerpt from the opinion in that case:

"The result of the evidence, as applied to the authorities, in our opinion, is that the process of refining sugar and molasses, as it is explained by the defendant's superintendent, is not a manufacturing process, and that defendant is not a manufacturer, in the general and common acceptation of that term. At its incipiency, the defendant purchases on the market, or from planters, a supply of sugar in a completely manufactured state, and by skillful manipulations, through the instrumentality of vast, elaborate and complicated machinery, and by an application thereto of steam power and great air pressure, same is first melted, then cleaned of its impurities, then bleached and improved in color, then dried, granulated and brought into sugar again, in exactly the same state it was when these manipulations were commenced, though greatly improved in purity and beauty of appearance, and rendered more merchantable. By this process sugar is refined in grain, improved in quality and bettered for commercial use; but it remains sugar still, like the cotton and the shells. It is given no new name, use, shape or combination. It is the self-same, identical raw material, just as when first manufactured from the cane and marketed by the planter. Tax exemptions are strictly construed, and cannot be sustained except under clear proof. Doubt is fatal to the claim."

The view we then took was that the refining processes are practically the same as a washing or scouring of the raw material, whereby the dirt and impurities are removed, and that the case was analogous to those wherein the process of cleaning muddy cotton and the process of cleaning and polishing shells had been held not to be manufacturing.

Having changed the views then so elaborately expressed, and thereby having placed ourselves in the awkward attitude of overruling ourselves, it behooves us to give good reasons for our present opinion; and we proceed to do so. Brevity and condensation are out of the question; we shall, however, endeavor to supply their place, as far as circumstances will permit, by distributing the matter of the discussion under appropriate heads.

### REVIEW OF THE COURT'S FORMER OPINION.

The fundamental error of the former opinion lies, we think, in the assumption that the raw material used by defendant is in "a com-"pletely manufactured state," and that this material is given "no new "name, use, shape or combination," but "remains sugar still, like the "cotton and the shells."

In the first place, only a small portion of the raw material used by defendant can be said to be "sugar;" the bulk of it is, in a crude state, not fit for use; and a great part is a substance disagreeable to taste, foul of smell and repulsive in appearance. In the next place, whatever may be the grade of the raw material, back it must go, to the liquid state, the same state in which it was when extracted from the cane or beet, except in respect to containing a larger percentage of saccharine matter, and a smaller percentage of foreign substances— a difference merely of degree. Since the raw material, whatever it may be, must be brought back to this liquid state—really a step backward in the process of manufacture—not the material as procured by the refiner, but this liquid, would seem to be the raw material operated on. But even assuming that the raw material is the article in the state in which it is procured by the manufacturer, it is given a new name, since the refined product has its distinctive commercial names—"Cube," "Granulated," "Powdered," "Confectioner's 'A,'"— each of which is distinctive from the other and from the raw material. If one were to ask in a store for "a pound of sugar," he would scarcely get it without specifying the distinctive name of the article he wished; no more than he would get his tobacco, unless he specified the kind— fine-cut, granulated, plug-cut, or plug. It is given a new use, since the bulk of it is converted from an article unfit for consumption into the refined sugar of modern commerce, and the part of it that was fit for consumption in its original state is converted into a different article of commerce, and virtually of use. It is given a new shape, since the old grain is dissolved and a new and different grain is formed, and part of the product is finally brought to a powder, and part moulded into cubes. It is given a new combination, since in the crude state it was in combination with molasses and impurities, and in the refined state it is almost chemically pure. The proportion of these compounds cannot be ascertained from the record, but their

volume is not so insignificant as might be supposed; of the impurities alone, twenty-five thousand to thirty thousand pounds are throwu off daily in the defendant's refinery.

If the raw material were customarily procured by the refiner in a liquid state, there would be no question, we apprehend, but that the refiner, who buys the liquid solution of sugar and turns out the refined product, is a manufacturer. How, then, is he the less a manufacturer when he buys the raw material in a state one step removed from a liquid, one step further away from the final product, and has to put it through the additional process of melting in order to reduce it to a proper form to begin the refining process upon?

It will not be denied that the making of raw sugar from the extracted juice of the cane or the beet is a manufacture. If such juice were wholly freed of its impurities by processes similar to those used by defendant, or otherwise, so that the first crystallization would be a refined product, such refined product also would unquestionably be a manufactured article.

If, instead of taking the cane juice or beet juice as the raw material to be purified and crystallized into sugar, the refiner begins his operations on a liquid solution of raw sugar as the raw material to be refined and crystallized, is he any the less a manufacturer than he who manufactures the sugar from the other liquid raw material—the juice of the cane or of the beet?

Many manufactured products, as the authorities hereinafter cited show and as a matter of common knowledge, are produced with but slight changes of form of the raw material and with but little hand-labor or machinery.

To illustrate by analogy, the producer of steel is unquestionably a manufacturer. He may buy the pig iron in a completely manufactured state, melt it, subject it to his particular steel-making process, and obtain steel, his manufactured product. Or he may have his own blast furnace, and run the molten product of the blast furnace directly to his converter, without going through the intermediate, and to him unnecessary, step of producing the pigs. In either case, equally, he is a manufacturer of steel. The re-melting of the pig iron in the first case is actually a backward step, but a necessary one, to get to the point of beginning the steel-making process.

So with sugar refining; it is as impossible to produce the refined

product from the raw sugar, without the latter being liquified, purified in the liquid state and recrystallized into the final product, as it is to make steel from crude pig iron without liquifying the iron and subjecting it in that state to the processes necessary to produce the steel. And the sugar refiner who produces the refined product from the liquified raw sugar, whether that raw material had ever before been crystallized or not, is as logically and as certainly a manufacturer as the producer of steel from the crude molten iron, whether that iron had ever before been crystallized into pigs or not.

If one should import for re-manufacture india rubber shoes of crude manufacture (as was done by the importer in Lawrence vs. Allen, 7 How. 785), and should melt them down and manufacture out of this material other and different india rubber shoes, the latter would without question be manufacturing articles, notwithstanding the material from which they were made had been at some prior time otherwise manufactured.

So where a sugar refiner takes the raw product, of crude manufacture, melts it down and makes out of it a new product, this new product is as much a manufactured article, made by the refiner's process, as was the original crude article. The raw material in such case completely loses its identity in the process of re-manufacture and an absolutely new and different article is formed.

## Meaning of the Word Manufacture.

"A manufacturer is not one who creates out of nothing, for that would surpass human power; neither is he one who produces a new article out of materials entirely raw. He is one who gives new shapes, new qualities, new combinations to matter which has already gone through some artificial process." City vs. LeBlanc, 34 La. An. 597.

"A manufacturer is defined to be one who is engaged in the business of working raw materials into wares suitable for use; who gives new shapes, new qualities, new combinations to matter, which has already gone through some artificial process." City vs. Ernst, 35 La. Ann. 746.

"The word 'manufacture' means the making of anything by hand or artifice. Railroad Co. vs. Fulgham, 91 Ala. 555; 8 South. Rep. 803. Mr. Worcester's Dictionary defines 'manufacture' as the 'process of making anything by art, or of reducing materials into a form fit for

use by the hand or by machinery.' The definition of the word as given by the Century Dictionary is as follows: 'The production of articles for use from raw or unprepared materials by giving these materials new forms, qualities, properties, or combinations, whether by hand labor or by machinery.' According to the above definitions of the word 'manufacture,' we are constrained to consider and declare an electric light company a manufacturing corporation to all intents and purposes. It is no answer to this argument to say that electricity exists in a state of nature, and that a corporation engaged in the electric light business collects or gathers such electricity. This does not fully or exactly express the process by which such corporations are able to make, sell and deliver something useful and valuable. The electricity that exists in nature is of a very different quality from that produced by means of machinery. The business in which an electric light company is engaged makes it necessary to invest large capital in the plant; and there is purchased and consumed coal and other materials to produce steam in order to furnish the power for the operation of the machinery. Then there is supplied and operated a complicated system of machinery, like that commonly used in manufacturing establishments, such as boilers, engines, dynamos, shafting, belting, etc., and then, by means of wires, cables and lamps, the mysterious power generated by the machinery used from the materials furnished is transmitted, and lights the streets and private houses. But the electric currents that produce these results cannot be said to be 'the free gifts of nature, gathered from the air or the clouds.' It is the product of capital and labor, and in this respect cannot be distinguished from ordinary manufacturing operations." Beggs vs. Edison Electric Light Co., 96 Ala. 295.

"Nearly all artificial products of human industry, nearly all such materials as have acquired changed conditions or new and specific combinations, whether from the direct action of the human hand, from chemical processes devised and directed by human skill, or by the employment of machinery, * * * are now commonly designated as manufactured." Carlin vs. Western Assur. Co., 57 Md. 526; 40 Am. Rep. 440.

"If the question whether a corporation engaged in the business of furnishing electricity for lighting public and private places, or for power, is a manufacturing company, was made to depend upon the meaning of these words as found in dictionaries, or upon the technical

language of science in describing electricity as a power, or as an agent in nature, it would doubtless be difficult, and perhaps impossible, to show that the process which relator calls 'manufacturing,' produces anything that, in a certain sense, and in some form, did not exist before. That, however, is true of most if not all manufacturing operations. The application of labor and skill to materials that exist in the natural state gives to them a new quality or characteristic, and adapts them to new uses; and the process by which this result is brought about is called manufacturing, whether the change is accomplished by manual labor or by means of machinery. But we think that these considerations are by no means conclusive in determining the true scope and meaning of the terms, 'manufacturing corporations,' as they are used in the statute.

"The true inquiry would seem to be whether a corporation organized as this is and carrying on the business that this does and in the manner shown, would not be considered in common language as engaged in some manufacturing process, or carrying on some manufacturing business, though granting all that is said by experts and others about electricity as a natural element of force." People vs. Wemple, 129 N. Y. 553.

"The primary meaning of the word 'manufacture' is something made by hand, as distinguished from a natural growth; but, as machinery has largely supplanted this primitive method, the word is now ordinarily used to denote an article upon the material of which labor has been expended to make the finished product. Ordinarily the article so manufactured takes a different form, or at least subserves a different purpose, from the original materials, and usually it is given a different name. Raw materials may be, and often are, subjected to successive processes of manufacture, each one of which is complete in itself, but several of which may be required to make the final product. Thus, logs are first manufactured into boards, planks, joists, scantlings, etc., and then by entirely different processes are fashioned into boxes, furniture, doors, windows, sashes, trimmings and the thousand and one articles manufactured wholly or in part of wood. The steel spring of a watch is made ultimately from iron ore, but by a large number of processes or transformations, each successive step in which is a distinct process of manufacture, and for which the article so

manufactured receives a different name." Tide Water Oil Co. vs. U.
S., 171 U. S. 216.

In holding the publisher of a newspaper to be a manufacturer, this
court said:

"All manufacturers combine, in greater or less degree, the products
of intellectual and mechanical labor, and in very many the intel-
lectual element confers upon the article produced its peculiar and
greatest value. Such is conspicuously the case with a newspaper; but
since the making of newspapers is a business; since the newspaper,
when made, is a new and distinct article of commerce; since the
process of making it requires machinery and manual labor and phy-
sical raw material, as this record shows, much the larger part of its
cost, we can see no sound reason why such a business does not fall
within the letter and spirit of the constitutional exemption as that of
a manufacturer.

"While we admit that newspaper publishing does not fall within the
common usage of the term 'manufacturer,' the Constitution, Art. 207,
attaches a broad meaning to the word by embracing within it the
occupations of stationers, boat-builders, chocolate makers, etc., which
are not ordinarily considered as manufacturers any more than news-
papers and book publishers.

"We are satisfied that the Legislature took the same view of the
subject, and this reinforces our own opinion." State vs. Dupre &
Hearsey, 42 Ann. 561 (564, 565).

And, finally:

"MANUFACTURES. The term 'manufactures' is now distinct-
ively employed to describe the processes and products of productive
industries, or of industries engaged in fitting crude materials and
natural growths for the higher uses of man in society. Primarily
these changes of natural forms were made by the hand of the artificer
or hand-worker, and hence they were called manufactures, but in
recent times machinery has by far the largest place in effecting these
changes of form. Wood, iron, and other materials are shaped and
changed by machinery; and wool, cotton, silk and flax assume all their
forms of adaptation to final use almost solely through the agency of
machinery. It would not now be practicable to express this fact in
the form of the definition afforded by a single descriptive word, how-
ever, and 'manufactures' will remain as the expression for all the

products reformed, shaped, fashioned, and combined in order to adapt them to the uses of man in society." Am. Sup. to Ency. Brit. (9th Ed.), Vol. XXIX, p. 307.

### ANALOGY TO OTHER INDUSTRIES HELD TO BE MANUFACTURES.

Tobacco. The manufacture of tobacco furnishes a striking analogy. There is no question about chewing and smoking tobacco and snuff being manufactured articles. The U. S. Revised Statutes and the Louisiana Constitutions of 1879 (Art. 206), and 1898 (Art. 229), call them manufactures.

The process of manufacture converts the raw material—leaf tobacco—into the manufactured articles, by removing stems and dirt, improving the color, drying or moistening, perhaps sweetening some kinds, and compressing, granulating, fine-cutting or pulverizing, according to the use for which intended.

The parallel with sugar refining is complete. The substance of the manufactured tobacco is still tobacco; it is called by no new name, and is used for the same purposes as the leaf tobacco, though rendered more fit for those uses.

The process of manufacturing tobacco accomplishes the same result as the refining of sugar, though it is much simpler, requires less machinery and the raw material never loses its original identity; *a fortiori*, then is the refining of sugar a manufacture.

Saw Milling. The cutting of rough lumber from logs—is manufacturing. State vs. A. Wilbert's Sons L. & S. Co., 51 La. Ann. 1223.

Sawn lumber is still in substance wood, and the logs may be put to the same use as the lumber, though not as fit therefor. Weather boards, flooring, etc., are in turn manufactured articles (see cases cited in Wilbert's case, *supra*) ; they are manufactured from the rough lumber, their substance is still wood, and they are put to no uses to which the rough lumber could not be put, though made more fit for such uses.

Dyeing and bleaching of cloth is manufacturing. Johnson vs. Sommerville Dyeing and Bleaching Co., 15 Gray (Mass.), 216 (218).

Salt. The production of salt, by process of evaporation, is a manufacture. East Saginaw Salt Mfg. Co. vs. East Saginaw, 13 Wall. 376; Salt·Co. of Onondaga vs. Wilkinson, No. 12,269, Federal cases; Central Ohio Salt Co. vs. Guthrie, 35 Ohio St. 666.

Kindling Wood.   The splitting, drying and bundling of kindling wood is a manufacture. People's Standard Wood Co. vs. Roberts, 47th. N. Y. Sup. 122.

Oil refining has been held to be a manufacturing process:

"Among the purposes for which the defendants incorporated themselves were 'refining oil, coal and other minerals and preparing them for use.' They were therefore strictly a manufacturing corporation.'" Hawes vs. Anglo-Saxon Petroleum Co., 101 Mass. 385 (396).

Pork packing is manufacturing.   Engle vs. Sohn, 41 Ohio St. 691;. 52 Am. Rep. 103.

Staves, rough split by hand, are manufactured articles.   United. States vs. Hathaway, 4 Wall. 404 (408).

Split timber, to be used in making shovel handles, is a manufactured product.   United States vs. Quimby, 4 Wall. 408.

Canning factories, which prepare fruits and vegetables for future use without changing the identity of the raw materials, are manufactories by the very term used to designate them.

Rattan.   The rind split from rattan, as well as the reed left after such splitting, are manufactured articles.   Foppes *et al.* vs. Magone,. Fed. Rep. 570.

Refined Bauxite, produced from crude bauxite by a refining process. of heating and consequent expulsion of other chemicals, is a manufactured article.   *In re* Irwin *et al.,* 62 Fed. Rep. 150.

Ivory.   Elephants' tusks sawed into pieces of various lengths when such sawing requires skill and judgment, with a view of separating the ivory into different grades, adapted to different uses, are manufactured. articles.   *In re* Gerdau, 54 Fed. Rep. 143.

Bones.   Crude bones, crushed and screened, become thereby manufactures of bones.   *In re* Gardner, 72 Fed. Rep. 494.

Rice millers, who simply hull, clean and polish rice, are manufacturers.   City of New Orleans vs. Ernst, 35 Ann. 746.

### AUTHORITY—POPULAR AND SCIENTIFIC.

The meaning of the word manufacture as used in the Constitution. is broader, rather than narrower, than its common meaning.   State vs. Dupre, *supra.*   It is proper, therefore, to see how the word has been. used by those skilled in the use of the words.   Definition is the state–

ment of the meaning commonly given to a word by those of respectable authority who make use of it.

Has this word "manufacture," then, been used by authorities to denote and include the industry and process of sugar refining? The following citations give the answer.

"Sugar-baker. *A manufacturer or refiner* of sugar. Worcester's Dictionary, v. Sugar-baker.

As it is a matter of common knowledge that the sugar-baker was the primitive sugar refiner, dealing only with crude sugar as his raw material, the above definition is peculiarly pertinent as conveying the statement that a sugar refiner was a manufacturer, even when using the comparatively few implements and simple process formerly employed in eradicating the impurities from crude sugars.

"Sugar-house. A house or building for preparing sugar from cane juice, or for refining sugar; a manufactory of sugar." *Id.,* v. Sugar-house.

"Sugar-house. A building in which sugar is made or refined; a sugar manufactory." Webster's Dictionary, v. Sugar-house.

"Sugar refining. * * * At present it is an important branch of *manufacture* in most of the principal commercial cities of the United States and Europe." Amercan Encyclopedia, Vol. XV, p. 446.

"The *manufacture* of loaf sugar is chiefly carried on in London; of crystals, in Bristol and Manchester; of crushed sugar, in Liverpool, Greenock, and Glasgow." Ure's Dictionary of Arts, Manufactures and Mines, Vol. III, p. 943.

"Manufacture of crystals. The use of centrifugal action for the separation of liquids and solids has been adopted in the arts for many years." * * * *Id. p.* 948.

"Crushed sugar. This process closely resembles the *manufacture* of loaf sugar, but the raw sugar used is generally of an inferior quality." *Id.* p. 948.

"Manufactures of United Kingdom exported. Refined sugar and candy, 1,119,542 cwt." *Id.* Vol. (sup.), p. 847.

"The refining of sugar is the leading *manufacture* in the city of New York. No other employs so much capital, or yields so large a product." * * * Bishop's History of American Maanufactures (1868), Vol. III, p. 150; and Vol. II, p. 593.

"Refined sugar and chocolate were among the extensive and prosperous domestic *manufactures.*" *Id.* Vol. II, p. 41.

"Annals of Manufactures. * * * The quantity of refined sugars sent out of the refineries during the year (1800) was 3,349,896 pounds, and the gross amount of duties thereon was $66,998." *Id.* Vol. II, p. 83.

"The *manufacture* of refined sugar in the eastern and middle States kept pace with the increase of population." * * * (As to year 1816.) *Id.* Vol. II, p. 220.

"Kentucy Factories. A large sugar refinery was put in operation in May (1813) at Louisville, Ky." *Id.* Vol. II, p. 247.

Sugar refining is classified as one of the *manufactures* of New York and Brooklyn. *Id.* Vol. II, p. 585.

"Looking at the manufacture of sugar in a broad way, it may be said to divide itself first into the production of crude sugar from the cane and from beet, the materials alone employed upon the largest scale and treated by methods careful and economical enough to deserve consideration as scientific industries, while these methods necessarily differ with the different character of the two materials. Then, as a large proportion of the crude sugar so obtained is, in other hands, and often in other countries, carried through an elaborate process of purification, *sugar refining becomes a distinct branch of the manufacture,* as in a comparatively simple way it has been from time immemorial, in India, practiced there by one caste receiving the supply of 'goor,' or crude, moist sugar, from another." U. S. International Exhibition, 1876, Vol. IV; Reports and Awards, pp. 18, 19 (Report of Dr. J. W. Mallet).

"Refined *manufactured* from raw sugar." (Statistics.) *Id.* p. 82.

"The sugar so made" (*i. e.,* loaf sugar) "is almost absolutely pure; as a rule, there is not more than 0.1 to 0.3 per cent. of impurity (including moisture) in it, and, whether the raw sugar used in its *manufacture* be 'beet' or 'cane,' it is equally pure." British Manufacturing Industries (Bevan, 1876), p. 128.

The factory returns of Great Britain and Ireland classify sugar refineries as *factories.* *Id.* "Industrial Classes and Industrial Statistics," p. 196.

Lock & Newlands, in their elaborate treatise, "Sugar, a Handbook

for Planters and Refiners" (London, 1888), at pp. 611 and 654, designate sugar refining as a *manufacture*.

"The immediate product of the first boiling of the cane juice is known as gurh or rab, according as the sugar is boiled down to a hard mass, or allowed to remain in a semi-liquid condition. Both gurh and rab contain some uncrystallized syrup. Gurh as a rule is intended for home consumption, and is comparatively seldom used in the *manufacture* of refined sugar." (Sketch of early refining in India.) Johnson's Universal Cyclopedia, Vol. VII, p. 207.

"*Manufacture* of Refined Sugar." (Title of article describing process of refining raw sugars.) Tomlinson's Cyclopœdia of Useful Arts and Manufactures, Vol. II, p. 785.

"The improvements introduced into the processes of sugar refining allow loaf sugar to be now sold at a price so little exceeding that of raw sugar that the *manufacture* has lately vastly increased." Knight's Cyclopoedia of Industry, p. 1628.

"A considerable quantity of the imports" (*i. e.*, of raw sugar) "is converted into refined sugar, a *manufacture* which forms an important branch of industry in Britain." * * * Waterson's Cyclopoedia of Commerce, p. 639.

"Ninety establishments are especially engaged in refining the first product extracted from beet root, or from the sugar cane; about 180,000 tons of raw sugar are received annually from the colonies, French and foreign, by those refining establishments, which employ 3,400 workers. The yearly value of the *manufacture* amounts to 140 millions of francs." Ency. Brit., "France," Vol. IX, p. 521 (9th Ed.)

"The *manufactures* of Egypt have been in a declining state for several centuries. Mehemet Ali tried to promote them by establishing large manufactories of cotton, silk and woolen goods, tarboshes, etc., and, especially in Upper Egypt, *sugar refineries*." Enc. Brit., Vol. VII, p. 786.

"But to return to the subject of sugar refining.

"In commencing the study of this *manufacturing operation*, it will be useful to consider the theoretical indications to be followed out." Debow's Review (Reprint, 1856), "The Southern States" Sugar, p. 239.

"Instead of the deep charcoal cistern, some *manufacturers* employ shallow tanks of iron or lead." *Id.* p. 241.

"If instead of loaves, the *manufacturer* desired to obtain the material known as crushed lump, the contents of the moulds would never be stoved at all." * * * *Idem,* p. 246.

"There is a considerable affectation prevalent among refiners of considering their *manufacture* absolutely perfect." *Idem,* p. 247.

"The largest single *manufacturing* industry in New Orleans is that of sugar refining. * * * The American Sugar Refining Company's plant in New Orleans is one of the largest *manufacturing* establishments in the country, and the third sugar refinery in size." Rightor's History of New Orleans, p. 528.

The Eleventh Census of the United States (1890) classifies sugar and molasses refining under the title, "Manufacturing Industries," Part 1, p. 108, and elsewhere.

In the same (Eleventh Census, 1890), Part II of Manufacturing Industries, p. xxxvi, "Sugar and Molasses Refining" is classified as the principal *manufacturing* industry, by gross value of product, in the several cities of Philadelphia, Brooklyn, San Francisco and New Orleans.

"Refining. The process of purifying copper, gold, tin, lead and some other metals. It is the last operation connected with smelting. *The term is also applied to the purification, on a manufacturing scale, of* nitre, common salt, *sugar* and other bodies." The American Educator (Phila., 1897) v. Refining.

To same effect is Zell's Encyclopedia and Dictionary, Vol. II, xx. v. Refining.

"Proportional impositions on *foreign refined sugar,* and proper drawbacks on exportation, ought of course to indemnify the *manufacturers of this article* among ourselves." Alexander Hamilton's Works, Vol. III, p. 51.

"Of these" (*i. e.,* manufacturing establishments) "it may not be improper to enumerate the most considerable: 1. * * * 9. *Refined sugars.* * * * Besides *manufactories of these articles,* which are carried on as regular trades, and have attained to a considerable degree of maturity, there is a vast scene of household manufacturing." *Idem,* Vol. III, p. 233.

"*Refined sugars* and chocolate are among the number of extensive and prosperous domestic *manufactures.*

"Drawbacks of the duties upon the materials of which they are

respectively made, in cases of exportation, would have a beneficial influence upon the *manufacture.*" *Idem,* Vol. III, p. 280.

"*Leading classes of manufactures.* * * * The more important classes here, as in Europe, are textile fabrics of wool, cotton and silk; iron and steel and manufactures of iron and steel; clothing and articles worn; * * * *sugar refined,* confectionery, etc." Am. Sup. to Enc. Brit. (9th Ed.), Vol. XXIX, p. 309, "Manufactures."

"For the fiscal year ending June 30th, 1885, the value of *manufactures exported* was $243,838,731, the leading items being as follows: Agricultural implements, $2,561,602; * * * *sugar refined,* $16,-071,767." * * * *Id.,* Vol. XXIX, pp. 311, 312.

"Brooklyn has more *manufacturing establishments* than any other city in the United States, except New York and Philadelphia. * * * The great increase of *sugar*—and petroleum—*refining,* ropes and cordage, hats, etc., etc., since 1880, makes the total product in 1883 .ver $250,000,000." *Idem,* Vol. XXVI, p. 749.

"The chief *manufactures* are cotton-seed oil, production, $3,739,000; lumber, $1,767,000; rice cleaning, $1,573,281; foundry and machine shops, $1,554,485; and *sugar refining,* $1,483,000." *Idem,* Vol. XXIX, p. 274, "Louisiana."

"A very large amount of *manufacturing* is carried on in Boston. * * * The leading *manufactures* in the list were the following: Boots and shoes * * * *sugar refining.*" *Idem,* Vol. XXVI, p. 669, "Boston."

"Refined sugar. * * * The art of refining has been carried to greater perfection in this country than in Europe, and so manifestly that no imported article can equal the fine granulated sugars of the *domestic manufacturer.* The business has spread with the demand for the improved sugars. The increase of the *manufacture* has also been aided by the Federal Government, which allows a drawback upon refined sugar exported equal to the duty on the equivalent raw sugar imported. * * * Some years since, the bounty or drawback upon refined sugar amounted to more than the duty on the raw article, and was, therefore, equivalent to an additional bounty on the *manufacture.*" "One Hundred Years' Progress of the United States," p. 392.

"*Chemical Manufactures.* Those arts which involve the question of chemical affinities, and, consequently, a change in the constitution of their subject-matter, may be distributed into three groups, according

to the kingdom of nature to which they belong; the mineral, the vegetable, and the animal. * * *

"Class II. The chemical *manufactures* of vegetable substances.

"Order I. *The art* of extracting and *refining sugar.*" Ure's Philosophy of Manufactures, pp. 63, 65.

"Among the earlier firms engaged in the sugar refining industry, the more prominent were those of R. L. & A. Stuart and the Havemeyers. * * *

"The house of Havemeyer was founded in New York in 1805, by A. & D. Havemeyer, in a little building in Vandam street, twenty-five by forty feet; four or five employees, with the proprietors, being sufficient to *manufacture* and deliver the product." "One Hundred Years of American Commerce" ("American Sugar"), pp. 259, 260.

"Not less than 800,000 tons of coal are annually consumed in the *manufacture of refined sugar.*" *Idem,* p. 260.

"Drawback or Bounty on the Exportation of Refined Sugar. * * * It was long suspected, and the fact seems to have been sufficiently established, that the drawback formerly allowed on the exportation of refined sugar was greater than the duty charged on the raw sugar used in its *manufacture.*" McCulloh's Commercial Dictionary, "Sugar," p. 1347. (London, 1882).

In discussing the export drawback on articles manufactured from imported materials, Senator Thomas H. Benton said:

"The particular application of this clause, as explained and enforced at the time, was to sugar and molasses, and the refined sugars and the rum *manufactured* from them.

"As the laws then stood, and according to the principle of all drawbacks, the exporters of these refined sugars and rum were allowed to draw back from the treasury, precisely as much money as had been paid into the treasury on the importation of the article out of which the exported article was *manufactured.* This was the principle, and this was the law; and so rigidly was this insisted upon by the *manufacturing* and exporting interest, the only four years before the compromise act, namely, 1829, the drawback on refined sugars was raised from four to five cents a pound." * * * Benton's "Thirty Years' View,' Vol. II, pp. 190, 191.

"These are facts to pause at and think upon. They imply that the sugar refiners *manufactured* more sugar than was imported into the

United States for each of these three years—that they not only *manu-factured,* but exported, in a refined state, more than was imported into the United States." * * * *Idem,* p. 191.

"The consumers of brown sugar will suffer in the same manner; for the *manufacturers* will monopolize it, and refine it, and have their five cents drawback, either at home or abroad. Add to all this, it will be well if enterprising dealers shall not impose domestic sugars upon the *manufacturers,* and thus convert the home crop into an article entitled to drawback.

"Such are the mischiefs of the Act of 1833 in relation to this article; they are great already, and still greater are yet to come. As early as 1837 the whole amount of the sugar revenue, and $861.71 besides, was delivered over to some twenty odd *manufacturers of refined sugars." Idem,* p. 192.

### AUTHORITY—LEGISLATIVE AND JUDICIAL.

Legislative and judicial interpretation bear out the conclusions that sugar refining is a manufacture.

In Coxe vs. Pennington (1 Wash. C. C. 65), No. 3311, Federal cases, Washington, Circuit Justice, said:

"The question then is, whether, upon refined sugars, not sent out of the house where they were *manufactured,* on or before the 3rd of June, the duties had accrued and then remained outstanding? * * * The sugar refiner is to report his house and the implements employed in his *manufactory."* No. 3311, Fed. cases.

In the same case, on writ of error:

"Sugar refined, but not sold and sent out of the *manufactory* before the 1st of July, 1802, is not liable to any duty upon being sent out after that day." Pennington vs. Coxe, 2 Cranch, 33.

"This was a feigned issue between Tench Coxe, a citizen of the State of Pennsylvania, and Edward Pennington, a citizen of the State of New York, to try the question whether sugar actually refined, but not sold and sent out of the *manufactory* before the 1st of July, 1802, is liable to any duty to the United States upon being sent out after that day." *Idem,* p. 33.

This case involved consideration of the effect of the Act of Congress of April 6, 1802, repealing the internal revenue duty on refined sugar imposed by Act of June 5, 1794.

Chief Justice Marshall delivered the opinion of the court, saying in part:

" * * * The fifth section" (*i. e.,* of the Act of June 5, 1794), "after making several regulations requiring the refiner of sugar to report the building and utensils to be employed in the *manufacture,* * * * proceeds to enact that he shall," etc. *Idem,* p. 51.

And again: "The object of the act imposing the duty being revenue, and not to discourage *manufactures,* it is reasonable to suppose that the attention of the Legislature would be devoted to the article in that state in which it was designed to be productive of revenue." *Idem,* p. 54.

Again: "If A becomes the debtor by the mere act of refining, then he remains the debtor until he shall be legally discharged. Suppose him to part with his *manufactory* and his capital stock, there being at the time of transfer a quantity of refined sugars in the building, which pass with it to the purchaser." *Idem,* p. 56.

Again: "With respect to the refiner of sugars, then, it must, on an inspection of the act, emphatically be said that the Legislature designed him to collect the duty from the consumer, but never to pay it from the *manufacture;* that the tax should infallibly be imposed on expense and never on labor." *Idem,* p. 62.

Again: "The refiner who is, in a different place, the retailer of sugars, must be considered as selling them from the *manufactory* when he sends them out of it to his retail store." *Idem,* p. 63.

Act of June 5, 1794 (1 U. S. Stat. 384 *et seq.*) :

"An act laying certain duties upon snuff and refined sugar:

"Sec. 7. And be it further enacted that, every *refiner of sugar* shall make oath * * * that the accounts, which have been by him or her rendered, or the quantities of *refined sugar* by him or her sent out of the house or building, where the same shall have been *manufactured,* or procured, or cause so to be sent out, have been just and true."

"Sec. 10. And be it further enacted that all snuff and refined sugar which shall have been *manufactured* or made within the United States in manner aforesaid shall," etc., etc., (be seized if tax not paid).

"Sec. 14. And be it further enacted that from and after the 30th day of September, next, no drawback of the duties upon any *manufactured* tobacco or snuff or *refined sugar,* which shall have been im-

ported into the United States  *   *   *   shall be allowed," * * *

"Sec. 20.   And be it further enacted that it shall be lawful to export, directly from any *manufactory* of snuff or of *refined sugar,* to any foreign port or place, any snuff or *refined sugar* which shall have been *manufactured* at such *manufactory,* after the 30th day of September next, free from duty.  *  *  *

Act of July 24, 1813 (3 U. S. Stat. 35) :

"An act laying duties on sugar refined within the United States."

"Sec. 3."   (Same as Sec. 7 of Act of June 5, 1794, above quoted.)

"Sec. 5.   And be it further enacted that all *refined sugar* which shall have been *manufactured* or made within the United States," etc. (shall be seized under certain conditions).

Act of August 30, 1842 (5 U. S. Stat. 563) :

"Sec. 14.   And be it further enacted that on and after the day this law goes into effect there shall be allowed a drawback on *foreign sugar refined* in the United States, and exported therefrom, equal in amount to the duty paid on foreign sugar from which it shall be *manufactured,* to be ascertained," etc., etc. (under regulations to be prescribed) :

Act of March 3, 1863.   (12 U. S. Stat. 716) :

"*Sugar refiners* shall pay one and one-half of one per cent. on the gross amount of the sales of all the products of their *manufactories."* *  *  *

Referring to the proviso of St. Mch, 3, 1875, ch. 127, Sec. 3 (18 U. S. Stat. 339), which amends Sec. 3019, U. S. Revised Statutes, Gould and Tucker in their Notes on the Revised Statutes, say (Vol. I, p. 636) :

"The proviso applies to all refined sugars *manufactured* from imported sugars, notwithstanding the other provisions of the chapter in which it is found."

14 Opinion Attorney General, 578 :

"Drawback on Refined Sugars.

"Thus construed, that proviso unquestionably applies to all refined sugars *manufactured* from imported sugars, irrespective of the other provisions contained in said Act of March 3, 1875." (p. 578).

The opinion was in answer to the following from the Secretary of the Treasury :

"Does the increase in the amount to be retained from the drawback

allowance on refined sugars, enacted by Section 3 of the Act of March 3, 1875, apply to all exportations of refined sugars *manufactured* from imported sugars, when such exportations are made subsequently to the passage of the Act, or only to exportations of refined sugars *manufactured* from crude sugars paying the increased rate of duty prescribed by the Act itself?" *Idem,* p. 578.

The Attorney General reached the conclusion that the proviso applied to all refined sugars exported, saying in conclusion:

"It" (*i. e.,* the proviso) "is an amendment of Section 3019 of the Revised Statutes, and must be construed in connection with that section, and not in connection with the Act of March 3, 1875; and, so construed, it operates as an exception or proviso in the former statute, and the two, in effect, enact that ten per centum on the amount of all drawbacks allowed by the statute shall be retained for the use of the United States; provided that of the drawback on refined sugars only one per centum of the amount so allowed shall be retained. So construed, there can be no question that the provision applies to all refined sugars *manufactured* from imported sugars, without reference to the Act of 1875." *Idem,* p. 580.

The interpretation of the United States Treasury Department is also pertinent.

*"To Collectors and Other Officers of the Customs—*

"The department being advised that manufacturers of condensed milk, confectionery, and other articles made wholly or in part from sugar, have on hand considerable quantities of *refined sugar manufactured* before March 1, 1891, *from duty-paid raw sugar,* which was purchased by them with the intention of being used in the manufacture of such articles for exportation with benefit of drawback, Circular No. 69 of May 7, 1891, discontinuing allowances of drawback on sugar used in the manufacture of such articles, is hereby rescinded." * * * U. S. Treasury Decision, No. 11,170, Vol. I, 1891, p. 553.

"When imported raw cane and beet sugars are 'blended' or mixed in *the process of manufacturing refined sugars* and syrups, the *manufacturer's* declarations must show, separately, the respective quantities of the different kinds and grades of the sugars so mixed. * * *

"For a fraction of a degree of test of the raw sugar used in the

*manufacture of either refined sugar* or syrup, the allowance of quantity of material shall be fixed by a proportionate division of the difference between the schedule allowances for the degrees next above and below such fraction." U. S. Treasury Decision, No. 17,325 (1896), p. 608.

"For fractional tests of the *raw cane sugar used in the manufacture of either refined sugar* or syrup, the allowances of quantity of material shall be computed in proportion to the schedule allowance for the degrees used above or below such fractional test." U. S. Treasury Decision, No. 16,738 (1896), p. 64 (65, 66).

"Sugars and syrups, refined, made wholly from imported raw sugars; base allowance on quantities of material used in the *manufacture* of each, respectively, as indicated in the following schedules and specifications." (p. 660.) . * * *

"When imported raw cane and beet sugars are 'blended' or mixed in *the process of manufacturing refined sugars* and syrups, the *manufacturer's* declarations must show," etc., etc. (p. 663). U. S. Treasury Decision, No. 17,355 (1896), pp. 660, 663.

Peculiarly pertinent is the following decision of the Board of U. S. Appraisers, holding that raw sugar loses its identity in the process of refining, and that the refined sugar is the product of the country in which the refining is done and not of the country where the sugar was made. This decision makes it plain that the refined sugar, being a new product, is necessarily a product manufactured from the raw materials used.

"Protest 15,415, 18 a, from New York, covers sugar refined in Great Britain. The sugar is of a high grade, and it is impossible to determine, by laboratory or other tests, whether its original source was cane or beets. The Board is of the opinion that *the identity of raw sugar is destroyed in the process of refining, and that the resulting product is the product of the country in which the refining is done,* and not of the country from which the raw sugar was obtained. We find that the sugar in question is the product of Great Britain, and as that country pays no bounties on the exportation of sugar, the protests are sustained." U. S. General Appraisers' Decision, No. 1884, reported in Treasury Decisions, Vol. II, 1892, pp. 1326 (1327).

In People vs. The North River Sugar Refining Co., 54 Hun. (N. Y.), 354, it is said:

"A *manufacturing* corporation which, with other corporations and

individuals, enters into and gives control of the business to a trust association * * * will be dissolved." * * * 54 Hun. 354.

"In an action brought by the State to vacate the charter of a *manufacturing* corporation, organized under the general manufacturing act (chap. 40 of the laws of 1848), it appeared that the corporation, while engaged in the business of refining and selling sugar, syrups and molasses, entered into a combination with certain other corporations and individuals engaged in the like *manufacture.* * * * *Idem,* p. 354.

"The judgment from which this appeal has been brought dissolved the defendant as a corporation previously formed and existing under the laws of this State. It was organized under chapter 40 of the laws of 1848 as a *manufacturing* corporation, and its business was generally that of refining and selling sugar, syrup and molasses. It was incorporated for this object in February, 1865, and continued to carry on the business until the close of the year 1887. Before that time, but in that year, a plan was formed and adopted for the formation of what was called the Sugar Refineries Company, to go into effect on the 1st of October, 1887. Its general object was to bring together the parties and corporations engaged in the *manufacture,* refining and sale of sugar." * * * *Idem,* pp. 356, 357.

The court uses the term "manufacturers," in reference to the above business (*Idem,* p. 384), and the expressions *"manufacture* of refined sugar" (*Idem,* p. 385) and "usefulness as a *manufacturing* competitor" (*Idem,* p. 385), and further says:

"Instead of *manufacturing* its product and disposing of it to the public on what might be fair competitive prices, it had become a party to a combination, in part, at least, designed to create a monopoly, and exact from the public prices which could not otherwise be obtained." *Idem,* p. 396.

In United States vs. E. C. Knight Co., 156 U. S. 1, we find:

"The American Sugar Refining Company, a corporation existing under the laws of the State of New Jersey, being in control of a large majority of the *manufactories of refined sugar* in the United States, acquired, through the purchase of stock in four Philadelphia refineries, such disposition over those *manufactories* throughout the United States as gave it a practical monopoly of the business. *Held*: That the result of the transaction was the creation of a monopoly in the

*manufacture* of a necessary of life, which could not be suppressed under the provisions of the Act of July 2nd, 1890."

Chief Justice Fuller delivered the opinion of the court, and from the opinion we extract the following:

"By the purchase of the stock of the four Philadelphia refineries with shares of its own stock, The American Sugar Refining Company acquired nearly complete control of the *manufacture of refined sugar* within the United States." *Idem,* p. 9.

"The fundamental question is whether, conceding that the existence of a monopoly in *manufacture* is established, the monopoly can be directly suppressed under the Act of Congress in the mode attempted by this bill." *Idem,* p. 11.

"The argument is that the power to control the *manufacture of refined sugar* is a monopoly over a necessary of life." * * * *Idem,* p. 12.

"The object was manifestly private gain in the *manufacture* of the commodity, but not through the control of interstate or foreign commerce." *Idem,* p. 17.

And in numerous other places the Chief Justice refers to the business as being a manufacturing business.

Mr. Justice Harlan dissented in the Knight case, and, in the course of his dissent, said:

"In its consideration of the important constitutional question presented, this court assumes on the record before us that the result of the transaction disclosed by the pleadings and proof was the creation of a monopoly in the *manufacture* of a necessary of life." *Idem,* p. 18.

"It has been argued that the combination between corporations of ifferent States, or between the stockholders of such corporation, with the object and effect of controlling not simply the *manufacture,* but the price of refined sugar through the whole of the United States— which is the case now before us—cannot be held to be in restraint of 'commerce among the States' and amenable to national authority, without conceding that the general government has authority to say what shall and what shall not be *manufactured* in the several States." *Idem,* p. 33.

In other portions of his dissent, Justice Harlan repeatedly uses the word "manufacture" in reference to the business under consideration;

it is unnecessary to quote at length. The quotations above amply show that the court accepted, without question, the conclusion that the business was a manufacturing business, and it is to be observed that the case actually hinged upon the fact that sugar refining was a manufacturing business.

In subsequent judicial references to the above decision, in United States vs. Trans-Missouri Freight Association, 166 U. S. 290 (326); United States vs. Addyston Pipe and Steel Co., 78 Fed. 712 (721); in same, 85 Fed. 271 (296, 297), (54 U. S. App.); and in Addyston P. & S. Co. vs. United States, 175 U. S. 211 (238-240), repeated use has been made of the words "manufacturer" and "manufacture" in reference to the sugar refiner and his product.

Like use of the expression is made by Prof. E. W. Huffcut in his recent article, "Federal Control of Corporations":

"As was held in the Knight case (156 U. S. 1), the anti-trust law does not extend to a corporation for the *manufacture* of sugar, because manufacture is not trade or commerce. Congress, therefore, could not suppress a monopoly for the *manufacture* of sugar, because manufacture is not trade or commerce." 34 Am. Law Review, 191.

The report of a recent lecture in this city by Dr. von Halle, the distinguished German political economist, states that the eminent lecturer said, regarding the present cost of refined sugar, that the refiner "paid far lower prices than formerly for *raw sugar out of which is manufactured the refined product.*" N. O. Times-Democrat, February 13, 1901.

Mr. William J. Bryan in his recent so-called Anti-Trust letter, published in the daily press, in criticism of the late President, says:

"He does not refer to the Sugar Trust case, which nullified the law of 1890 so far as manufacturing monopolies are concerned. In that case the court drew a distinction between a monopoly in manufacture and a monopoly in interstate commerce, and held that the law did not prohibit a monopoly in manufacture. * * * The language used by the court in condemnation of Federal interference with *manufacturing* conducted within a State is so strong that Justice Harlan assumes that the court would hold unconstitutional any amendment of the present law aimed at monopoly in *manufacture.*" N. O. Times-Democrat, January 11, 1900.

Referring to the same case (U. S. vs. Knight Co., 156 U. S. 1), Mr. Alfred Russell says:

"The latest monopoly which has been sustained is that of the Sugar Trust, where the court held that the law of Congress, commonly called the Sherman Anti-Trust Act, and entitled 'An Act to protect Trade and Commerce against unlawful restraints and monopolies,' does not forbid a combination formed between *manufacturing companies* for buying up shares of all competing companies, nor, by controlling the output of *the commodity which these corporations* manufacture to control the market as to that commodity throughout the Union. The court said that *the matter of manufacture* was subject only to the police power of the State.

"The dissenting opinion of Mr. Justice Harlan declared that the trust was a conspiracy against interstate commerce throughout the Union, and that *the control of local manufacturing* was simply a means to an end." Russell on Police Powers of the State, pp. 179, 180.

So also the refining of sugar is referred to as a manufacture by Professor Tiedman in his "State and Federal Control of Persons and Property," Vol. II, pp. 1063, 1064.

Mr. Justice Peckham used the following expression in the Addyston pipe case:

"Such enterprises may be of the same nature as the *manufacturing of refined sugar;* that is, the parties may be engaged as *manufacturers of* a commodity which they thereafter intend at some time to sell."
* * * Addyston Pipe Co. vs. U. S., 175 U. S. 211 (246, 247).

In commenting upon the same case (U. S. vs. E. C. Knight Co., 156 U. S. 1), Mr. Eddy, in his recent work on Combinations, says:

"The Supreme Court of the United States has had occasion to pass directly upon the Anti-Trust Act:

"1. In a case involving a corporate combination of manufacturers, the object of which was to control *the manufacture of sugar."* Eddy on Combinations, Sec. 816, p. 915.

*"Corporate combinations of manufacturers—Sugar Refineries:* It is not contrary to the provisions of the Act for a corporation *engaged in the manufacture* and sale of a staple article to purchase the plants of competitors situated and doing business in different States, with the

object of *controlling the manufacture* and the sale of the particular commodity. * * *

"In order to secure complete control of the price of sugar in the United States the American Sugar Refining Company entered into negotiations whereby it secured the control of the capital stock of the four corporations named, thereby securing a *monopoly* in the manufacture and sale of refined sugars." *Idem,* Sec. 818, p. 918.

So, again, in the American Law Review:

" * * * On the other hand, in the Sugar Trust case, the court, one judge dissenting, refused to extend the so-called Federal Anti-Trust Law to a combination of corporations whose plants were situated in different States, engaged in refining sugar for sale, which combination had the effect of creating an almost absolute monopoly of interstate commerce in that commodity, which effect was the very object of the combination, the court stumbling upon the proposition that they were engaged primarily in *manufacturing,* and only incidentally in selling." 34 Am. Law Review, 929.

In reporting the recent decision of the U. S. Supreme Court in American Sugar Refining Co. vs. Louisiana, the editor of the Lawyers' Co-operative edition, while erroneously stating the point decided, gives a good illustration of how the ordinary mind chooses the word "manufacturer" to denote a sugar refiner. He says:

"*A manufacturer engaged in the business of refining sugar* is not denied the equal protection of the laws because of the discrimination made by Louisiana Constitution of 1879, Art. 206, imposing a license tax upon *manufacturers* engaged in such business, but exempting from the tax those who refine the products of their own plantations." American Sugar Refining Co. vs. Louisiana, 45 Lawyers' Co.-op. Ed., U. S. Sup. Ct. Rep., 102.

"On writ of error to the Supreme Court of Louisiana to review a decision sustaining the constitutionality of a license tax *on manufacturers engaged in the business of refining sugar.*" *Idem,* p. 102.

And referring to the same decision, the Central Law Journal of January 11, 1901 (Vol. 52, No. 2, p. 24), says:

"In American Sugar Refining Co. vs. State of Louisiana, 21 Sup. Ct. Rep. 43, it was held that *a manufacturer engaged in the business of refining sugar* is not denied the equal protection of the laws because of a discrimination made by the Louisiana Constitution of 1879 (Art.

206) imposing a license tax upon the *manufacturers engaged in such business* and exempting from the tax those who refine the products of their own plantations."

In Union Sugar Refinery vs. Mathieson *et al.,* 3 Cliff. 639, Fed. Cas. No. 14,399, the question was as to the infringement of a certain patent relating to the cleansing and purifying of sugar in the process of refining. Mr. Justice Clifford, in charging the jury, twice used the word "manufacture" to denote the process of refining sugar. (24 Fed. Cas., pp. 693, 696).

Lastly, the Civil Code of Louisiana, Art. 468: * * *

"The utensils necessary for working cotton and saw-mills, tafia distilleries, *sugar refineries and other manufactures.*"

It would draw out this opinion to a most unconscionable length and be exceedingly laborious, and would really serve no useful purpose, to point out specially the application of the foregoing references to the facts of this case. With a view to avoiding that necessity our plan has been to bring forward the citations in such way that their application to the facts of the case might readily suggest itself as we went along. The conclusion from them is irresistible, we think, that sugar refining on a commercial scale is manufacturing. Courts and writers seem to have had no hesitancy at all in applying the word manufacture to sugar refining; in fact, they seem to have been unable to express themselves on the subject of sugar refining without making use of the word manufacture. It is such use that fixes the popular meaning of a word, and the word as used in the Constitution has to be construed according to its popular meaning. This court has so said on several occasions, and Civil Code, Art. 14, is express to the effect that "the words of a law are generally to be understood in their most usual signification, without attending so much to the niceties of grammar rules as to the general and popular meaning of the words."

If it be contended that the cases and statutes cited, although they use the terms "manufacture," "manufactured," "manufacturer," and "manufactory," in reference to the process, product, producer and establishment, respectively, are not of authoritative force, because the question of manufacture, *vel non,* was not presented, it may be answered that they assumed the conclusion as one which could not be controverted.

In the case of State vs. A. Wilbert's Sons L. & S. Co., 51 Ann. 1223,

in support of the conclusion, that a saw-mill is a manufactory, the court said: "But it is worthy of notice that in Improvement Co. vs. Browne, *supra* (45 Ann. 459), saw-mills and planing mills were mentioned specifically as 'manufactories.'"

In its opinion in the former case, the court said that defendant "is not a manufacturer *in the sense* of Article 206 of the Constitution of 1879." Necessarily the court held defendant not to be a manufacturer in any sense. For if a manufacturer in any sense, defendant is exempt from license tax, as there is no room for limiting or restricting the language of the Constitution, nor was there in the opinion rendered any purpose to do so. The Constitution exempts *all* manufacturers except those specially excepted.

As said in Wilbert's case, 51 Ann. 1223 (1231): "Under the former" (Art. 229 of the Constitution of 1898), "*all* manufacturers *eo nomine,* and all persons engaged in mechanical pursuits, are exempted from license taxation, other than those excepted."

And in Weckerling's case, 38 Ann. 37: "We have heretofore held that the Constitution clearly exempts from license tax *all* manufacturers not excepted."

Also in Washburn's case, 43 Ann. 226: "It will be observed that *all* manufacturers are; in terms, excepted, unless they are included within the express reservation of that Article (206).

So in the Ernst case, 43 Ann. 746 (747):

"The Constitution clearly exempts *all* manufacturers not excepted. The excepted ones are: those who manufacture alcoholic or malt liquors, tobacco and cigars and cotton seed oil. As the defendants do not come within the exclusion, it is manifest that the license claimed cannot be recovered."

While courts are not generally concerned with the policy or impolicy of laws, but only with their legality, construction and enforcement, yet the motive which prompted the law-maker is properly to be considered by courts in considering a particular law.

It is well known that prior to 1879 industrial pursuits had so languished in this State that the wage-earners were threatened almost with starvation. It was recognized that the prosperity of a community lies in its power to produce. The Constitution of 1879 (Art. 207), in furtherance of this principle, wholly exempted from property and license taxation certain specified manufacturing industries, and

(Art. 206) wholly exempted from license taxation *all* manufacturers other than a limited few which it was not the policy of the State to foster.

The industry of sugar refining, requiring as it does the employment of much labor, skilled and unskilled, the purchase of fuel and supplies, the importation from abroad of raw material for economical operation, many changes of form in the process and the production of a new article of commerce, comes directly within the motive and purpose of the exemption. The industry seems to have been always and constantly classified as a manufacturing industry and the definitions of the word "manufacturer" are amply broad to include this particular industry. It surely fits the raw material for the uses of man in civilized life; and in doing so uses elaborate machining and chemical processes involving numerous changes of form in the material worked upon.

It is worthy of note that high authority has held the refined sugar to be a new product—a product of the country where the refining is done and not of the country where the raw material is produced. The same authority holds that the raw sugar, in undergoing the process of refining, completely loses its original identity.

This is true as well of the highest grades of raw sugar as of the lowest. No refining, we again repeat, is possible, except by reducing to a liquid form, purifying in that form, and recrystallizing into sugar. The result can be accomplished by no other method. We cannot escape the conclusion that the purification of the raw beet sugars— disagreeable to taste, foul of smell, repulsive in appearance, as they are, and used for no other purpose in the crude state—in the manner disclosed by this record, necessarily constitutes a manufacturing process. No element of manufacture is lacking; what was not fit for use is rendered fit for use by an elaborate diversified method of treatment, and an entirely new article is produced; and what is true of these sugars is also true of all those that go through the same process. Our conclusion is that defendant is a manufacturer and is exempt from license taxation.

Protracted and laborious the task of the consideration of this case has been, but not so arid as might appear, thanks to the masterly presentation of the case on both sides, both in the oral arguments and in the briefs. Counsel are the helpers of the court, and their assistance is

but the performance of a duty, still when their work has been so liberally done a word of appreciation and of acknowledgment may not be unfitting or unowing from the court.

It is ordered, adjudged and decreed, that the judgment of the lower court be set aside and that this suit be dismissed.

Rehearing refused.