**145 So. 521**

## STATE v. GARDNER & JACOB CO., Inc.

### No. 31742.

Nov. 28, 1932.

Rehearing Denied Jan. 3, 1933.

Charles J. Rivet, of New Orleans, for the State.

Harry P. Sneed, of New Orleans, for appellee.

ST. PAUL, J.

This is a rule taken by the state for an additional license (occupational tax). Defendant resists the claim on the ground that:

The purpose of said rule is to force respondent to pay a wholesale license for the

privilege of engaging in manufacturing; in which business respondent is also engaged. That respondent is a manufacturer of boiled ham; purchasing pork legs, putting the raw material through a soaking and curing process, then boiling, then packing.

That it (respondent) employs considerable equipment and labor in such process; and is a manufacturer of the said product.

That the present license law of Louisiana not only fails to impose a license tax upon manufacturers, but said License Act, to wit, Act No. 205 of 1924, as amended by Act No. 132 of 1928, specially exempts from license tax manufacturers who sell their product exclusively to dealers for resale; and your respondent so disposes of its product. The trial judge sustained this defense, and the state appeals.

I

We quote in full the entire evidence taken in the case, thus:

Louis E. Jacob, being duly sworn by the minute clerk, testified as follows:

By Mr. Sneed:

"Q. What is your connection with the Gardner & Jacob Company? Ans. Secretary-Treasurer.

"Q. How long have you been connected with them? Ans. Ever since they existed.

"Q. Are you active in the business, and [do you] know its affairs? Ans. Yes, sir.

"Q. This is a rule for additional license. The question is whether or not an amount of fifty and odd thousand dollars is from the sale of manufactured products. What process, if any, does your company employ from the time they buy pork legs to the time they are turned over to the purchaser? Ans. First, they are soaked in a tank, between 4½ and 5 hours; then, they are put in the smoke house and stay there all night; and next day they are put in a boiling tank and boiled 4½ to 5 hours; then, they are cooled off and wrapped in ham wrappers.

"Q. In the smoke house, what is done to them? Ans. They are hung up and smoked with burned mahogany dust.

"Q. They go through a process of curing? Ans. Yes, sir.

"Q. After that the packages are made— of the hams? Ans. Yes, sir.

"Q. How are the hams sold? Ans. As boiled hams; to the grocery stores; no families at all.

"Q. You don't sell to the consumer at all? Ans. No, sir; to retail trade only.

"Q. Is your corporation a member of the Louisiana Manufacturers' Association? Ans. I think it is.

"Q. What equipment do you use in connection with the processing of the hams? Ans. We have soaking tanks; a regular smoke house, with trolleys to it to hang the hams on and roll them in; and a boiling tank.

"Q. How about the wrapping? Ans. That is done by hand, the wrapping; that is the only thing."

II

In the "Creole Cook Book," Second Edition (1920), published by the Old New Orleans Picayune, we find the following useful household recipes (page 114):

"*Pickled Pork:* (Ingredients: 25 Pounds of Pork; 1 Ounce of Saltpetre; Coarse Salt

sufficient to make a Brine; 12 Bay Leaves; 2 Dozen Onions; 12 Cloves; 6 Allspice.)

"Pork should be pickled about twenty hours after killing. It is pickled always in sufficient quantity to last some time, for, if proper care be taken, it will keep one year after pickling; but it may also be pickled in smaller quantities, of three or four pounds at a time, reducing other ingredients in the recipe according to quantity of pork used. To twenty-five pounds of pork allow one ounce of saltpetre. Pulverize thoroughly and mix with a sufficient quantity of salt to thoroughly salt the pork. Cut the pork into pieces of about two pounds, and slash each piece through the skin, and then rub thoroughly with the salt and saltpetre mixture till the meat is thoroughly penetrated through and through. Mash the cloves very fine, and ground the allspice; chop the onions. Take a small barrel and place at the bottom a layer of salt, then a layer of coarsely chopped onions, and sprinkle over this a layer of the spices and minced bay leaves. Place on this a layer of the pork; pack tightly; then place above this a layer of the salt and seasonings, and continue with alternate layers of pork and seasonings till the pork is used up. Conclude with a layer of the minced herbs and spices, and have a layer of salt on top. Cover the preparation with a board, on which a heavy weight must be placed. It will be ready for use in about ten or twelve days.

"*Boiled Ham:* (Ingredients: A Ham; 2 Blades of Mace; 1 Dozen Cloves; 4 Bay Leaves; Black Pepper and Parsley to garnish.)

"Wash the ham well in cold water, scraping off all portions of mold or salt. Have a large boiler of water on the stove; or, better still, the furnace. Throw in two blades of mace, a dozen cloves, and three or four bay leaves. Put the ham in the water, and let the fire be slow, allowing the water to heat gradually. Do not permit it to come to a boil for two hours at least, and be careful to skim carefully, so that all rejected substances may not impregnate the ham. Keep it simmering gently, allowing twenty minutes to every pound. When done, let the ham cool in its own liquor, and then put the ham on a board; cover with another board, and lay a weight over it. Leave under weight several hours; this will enable you to cut the ham in thin slices after removing the weight. Then carefully remove the skin without taking off the fat. Sprinkle it in patches with black pepper and ornament the shank bone with quilled paper, or a paper frill. Serve it cold, with a garnish of parsley. Cold boiled ham should be sliced very thin, and served with pickles and mustard."

Except for the overnight smoking with burned mahogany dust and the use of trolleys leading to the smokehouse to hang the hams on and roll them in, and the wrapping, the processes involved in these two recipes seem to be more elaborate, to involve more painstaking, and to require longer than those used by defendant. And eliminating the trolleys and wrapping, which could not of themselves alone make the process a manufacturing process if it were not otherwise so, we think that the overnight smoking of the raw meat with burned mahogany dust cannot even be said to be "really [only] an elaboration of the time-honored method of preparing and curing in the grimy little

smokehouse of the farmer." (Quotation from Commonwealth v. Weiland Packing Co., 292 Pa. 447, 141 A. 148, 150.)

### III

In his monumental and epoch-marking work on the "Wealth of Nations" Doctor Adam Smith, the Father of the Modern Science of Political Economy, says (Book II, Chapter 3):

"There is one sort of labor which adds to the value of the subject upon which it is bestowed; there is another which has no such effect. The former, as it produces a value, may be called *productive;* the latter *unproductive* labor. Thus the labor of a manufacturer adds generally to the value of the materials which he works upon that of his own maintenance and of his master's profit. The labor of a menial servant, on the contrary, adds to the value of nothing. Though the manufacturer has his wages advanced to him by his master, he in reality costs him no expense, the value of those wages being generally restored, together with a profit, in the improved value of the subject upon which it is bestowed. But the maintenance of a menial servant never is restored. A man grows rich by employing a multitude of manufacturers; he grows poor by maintaining a multitude of menial servants. The labor of the latter, however, has its value and deserves its reward as well as that of the former. *But the labor of the manufacturer fixes and realizes itself in some particular subject or vendible commodity, which lasts for some time at least after that labor is passed. It is, as it were, a certain quantity of labor stocked and stored up, to be employed, if necessary, upon some oth-*er *occasion.* That subject, or what is the same thing, the price of that subject, can afterwards, if necessary, put into motion a quantity of labor equal to that which had originally produced it. The labor of the menial servant, on the contrary, does not fix or realize itself in any particular subject or vendible commodity. *His services generally perish in the very instant of their performance, and seldom leave any trace of value behind them for which an equal quantity of service could afterwards be procured.* (Italics by this writer.)"

### IV

Hence, "it is not every employment of labor which will make the thing upon which it is employed a manufacture." City of New Orleans v. New Orleans Coffee Co., 46 La. Ann. 86, 14 So. 502, 503. For the essential difference between manufacturers and mere servants is in the result accomplished by their labor and not in the method by which it is accomplished. The labor of the servant perishes with its rendition; that of the manufacturer lives afterward—lives in the article which was produced by him, and which lasts, without sensible deterioration, at least some appreciable time after those services have ceased.

And a thoughtful study, as distinguished from a mere superficial reading, of the many cases in which this court has considered the question of manufacturer vel non, must convince any one that at bottom its whole long line of jurisprudence thereon, excepting only some isolated case or cases, seemingly out of line, is (emphatically) not just "hap-hazard," but thoroughly sound and consistent, and based *fundamentally* on that very distinction, even though never mentioned tot verbis.

## V

Thus, the mere use of machinery, great or small, does not ipso facto make one a manufacturer. State v. New Orleans Ry. & Lt. Co., 116 La. 144, 40 So. 597, 7 Ann. Cas. 724; Brooklyn Cooperage Co. v. City of New Orleans, 47 La. Ann. 1314, 17 So. 804; City of New Orleans v. Mannessier, 32 La. Ann. 1075.

Thus also, makers and vendors of ice cream, and bakers and venders of bread, are not ipso facto manufacturers. City of New Orleans v. Mannessier, 32 La. Ann. 1075; State v. Eckendorf, 46 La. Ann. 131, 14 So. 518.

But a maker of ice cream, whose product can be, and is (owing to modern progress in chemistry and refrigeration), *shipped* into outside states and sold *there*, has rightly been held to be a manufacturer. State Tax Coll. v. Brown, 140 La. 928, 74 So. 253. And a baker of "crackers, biscuits, etc.," making "from 160 to 175 varieties," also "soup paste" and "fancy paste," but "no bread, such as is commonly known as baker's bread," all such products being *evidently* intended not for mere immediate consumption but to be "shipped over a territory of 2500 square miles," has justly been held to be a manufacturer. State v. American Biscuit Mfg. Co., 47 La. Ann. 160, 16 So. 750.

## VI

We say "rightly" and "justly" held to be manufacturers. For although, for instance, the business of a maker from day to day and itinerant "peddler of ice cream," is not "manufacturing," and any attempt to "magnify a confectionery into a manufactory" and "cooks and pastrymen into manufacturers"

must fail (City of New Orleans v. Mannessier, 32 La. Ann. 1075), yet there is sound reason for distinguishing, "36 years later," between such a business and that carried on by a great industrial plant whose product can be, and is, regularly *shipped* into outside states and sold *there;* a *new* business, born of modern engineering and chemical progress, and having only *casual* similarity to the former;—a business *impossible* "36 years" earlier. For—

"It will hardly do to say, because pork, beef, soups, vegetables, and fruits may be prepared, in any of the forms in which they are used, in the kitchens of private houses, restaurants, and hotels, that there can be no such things as packing and canning establishments, or that Menier and Huyler [international and interstate shippers of chocolates and chocolate candies made by themselves] any the less manufacture chocolate into various forms and combinations because the same thing may be done as an incident to the business of an ordinary confectioner. A few children may make as good candy as the world can produce, in a single tin cup, but, if they grow up, engage in the making of candy as a business, place their product on the market, and, perhaps, ship it to all parts of the world, no one will deny that they become manufacturers in every known and accepted sense in which that word is used." State Tax Coll. v. Brown, 140 La. 928, 935, 74 So. 253, 256.

## VII

Therefore in practically every case, if not indeed in absolutely every case but one, in which one has been held to be a manufacturer, his product has been such as had some ap-

preciable degree of permanence. A few examples only will suffice.

In City of New Orleans v. Le Blanc, 34 La. Ann. 596, "The record shows that they [the defendants] are coopers, mechanics who employ assistants; that they make barrels, hogsheads from rough logs and splits. * * * "

In City of New Orleans v. Ernst, 35 La. Ann. 746, defendants were "carrying on the rice milling business. * * * The milling of it [rice] is effected by different processes, during which it passes from its original roughness to conditions in which it is fit for different uses [though still continuing only rice, just simply rice, and still intended and fit for the one same and only use to which it had always been put since the very foundation of the world of man, towit, as food for the human race]." But "deprived of its outer shell, and of the silica enveloping the denuded grain, it becomes an object of marketable value [just as it always had been; but the labor bestowed upon it had made it more attractive, more palatable, and hence more desirable, and therefore that much more valuable]." And rice, if properly stored and cared for, will last from season to season, or longer.

The process of sugar refining and the result thereof, mutandis mutatis, are exactly the same as in rice milling; that process being nothing more nor less than *cleaning* the raw sugar, just as rice milling is nothing else but rice cleaning. But refined sugar is far more palatable, more attractive, more permanent than raw sugar, and therefore far more desirable and more valuable. Hence, a sugar refiner is a manufacturer; just as is a

rice miller. State v. American Sugar Refining Co., 108 La. 603, 32 So. 965.

The making of burlap bags is simply the making of bags out of burlap bagging instead of out of other cloth or out of paper; but the bags when made have a permanent value far greater than mere burlap bagging. So a maker of burlap bags is a manufacturer. State v. Bemis Bro. Bag Co., 135 La. 397, 65 So. 554.

Creosoted poles and timber are, of course, almost everlasting, and immensely more valuable after the processing than before. Cf. State v. American Creosote Works, 163 La. 547, 112 So. 412.

Cottonseed oil and any other vegetable oil will keep for ages in sealed containers. Cf. State v. Southern Cotton Oil Co., 164 La. 225, 113 So. 825.

State v. Dupre, 42 La. Ann. 561, 7 So. 727, seems "out of line." A mere newsprint is read or glanced over and then consigned to oblivion or worse. Publishers and venders of newsprints are not manufacturers of "stationery" or books, but at most of news; and news ceases to be news within the hour. Cf. Nicholson v. Parker, Tax. Coll., 44 La. Ann. 76, 10 So. 403.

On the other hand, a maker of ice cream for immediate consumption, a baker of bread for immediate use, are not manufacturers; nor yet a producer and distributor of electricity (which perishes instantly as it is produced), even though it operates a large "plant," and "consumes upwards of 33,000 tons of coal annually in operating its said plant." City of New Orleans v. Mannessier, 32 La. Ann. 1075; State v. Eckendorf, 46 La. Ann. 131, 14 So. 518; State v. New Orleans

Ry. & Light Co., 116 La. 144, 40 So. 597, 7 Ann. Cas. 724.

Nor are commercial printers and stationers manufacturers, who only cut, rule, and print letterheads, billheads, forms, and account books for their customers to supply their immediate and individual needs. Patterson v. City of New Orleans, 47 La. Ann. 275, 16 So. 815.

Neither does a "coffee roaster" become a manufacturer by simply "manipulating" green coffee and thereby merely giving the same coffee "different and recognizable tastes and flavors." - City of New Orleans v. New Orleans Coffee Co., 46 La. Ann. 86, 14 So. 502.

The obiter dicta in Lake v. Guillotte, Tax Coll., 48 La. Ann. 870, 19 So. 924, seems to be slightly "out of line" *the other way;* though justifiable, perhaps, on the ground that "the work done in Louisiana is infinitesimal" as compared with the work done elsewhere. But the case itself correctly holds that the assembler, or maker, or manufacturer (if you will), of "umbrellas and parasols," made of wood and metal and cloth, is not a manufacturer of "textile fabrics" and "articles of wood"; no more than is one engaged in cutting and making coats and pants, out of jeans cloth made by another, a manufacturer of "textile fabrics." Cohn v. Parker, Tax Coll., 41 La. Ann. 894, 6 So. 718.

### VIII

The conclusion we have reached is that the product of this defendant's operations is not of that character which entitles it to be classed as a manufacturer. It may come near, but it does not come near enough, to the precedents established in State v. American Biscuit Mfg. Co., 47 La. Ann. 160, 16 So. 750, and State v. Brown, 140 La. 928, 74 So. 253, but it does come quite within the precedents established in City of New Orleans v. Mannessier, 32 La. Ann. 1075, and State v. Eckendorf, 46 La. Ann. 131, 14 So. 518. It is not, and does not claim to be, a producer of pickled pork, though its product goes through a short process of pickling and curing before it is finally prepared for delivery to the retailer ready for the consumer; a process, however, far less elaborate than that which goes on at times in domestic kitchens. It is, and it claims to be, only a producer of boiled hams. For this it has a method which enables it to produce "boiled ham" directly from fresh pork legs instead of from the more expensive "cured" product. Its method saves for the retailer of boiled ham the long and laborious effort of preparing his own ham, which he serves to his trade. But there is nothing which shows, after all is said and done, that what the retailer gets is anything but boiled ham no different from the boiled ham of the domestic kitchen.

### Decree.

For the reasons assigned the judgment appealed from is reversed, and it is now ordered that the state have judgment against the defendant as prayed for, and at defendant's cost in all courts.

ODOM, J., concurs in the decree.

BRUNOT, J., dissents.

O'NIELL, C. J. (dissenting).

As I understand the prevailing opinion in this case, it is founded upon the belief that;

in the jurisprudence of this court, except perhaps in one case, the establishments which have been declared to be manufacturing establishments were those which turned out articles of a lasting quality, and the establishments which have been declared not manufacturing establishments were those which turned out only articles intended for immediate consumption. I do not think the question, whether one is a manufacturer or not a manufacturer, in the meaning of the law exempting a manufacturer from the payment of a license tax, has ever been tested, or should be tested, by the durable or perishable quality of the article which he makes.

In City of New Orleans v. New Orleans Coffee Company, 46 La. Ann. 86, 14 So. 502, 503, the reason why the coffee roaster was held to be not a manufacturer was that he did not change the form of the coffee by grinding it. The court said:

"We have considered the evidence and the pleadings with care, and we are satisfied that the defendant corporation does not claim that it is a manufacturer by reason of grinding coffee, and thereby changing its form; and, while some incidental statements to be found in the testimony might indicate that exceptionally the defendant corporation may grind the coffee which it manipulates, its claim to be a manufacturer of coffee is based wholly on the production of brands of unground roasted coffee."

In Downs, Tax Collector, v. Dunn, 162 La. 747, 111 So. 82, which decision is not referred to or cited in the prevailing opinion in the present case, it was held that one who bought green coffee in large quantities and parched and ground it, mixed it with chico-

ry, and put it up in packages of convenient size for the retail trade, was a manufacturer. The product of the New Orleans Coffee Company's establishment was not any more intended for immediate consumption than the product of Dunn's establishment. In both cases the coffee was intended for resale by retail grocers, just as the hams are in the present case.

My opinion is that the reason why the court made a distinction between the ice cream business carried on by Mannessier, in 1880, and that which was carried on by Brown, in 1917, was not so much because Mannessier's ice cream was intended for more immediate consumption, as because of the enormous difference in the size or extent of the business done by Brown, in comparison with that which had been done by Mannessier. The only reason why ice cream had become more durable in Brown's time than it was in Mannessier's time was the improvement in the process of refrigeration, particularly with regard to shipments of perishable goods.

It is true that, in State v. Eckendorf, 46 La. Ann. 131, 14 So. 518, in 1894, it was held that the business of baking bread was not that of a manufacturer; but in State v. Lanasa, 151 La. 706, 92 So. 306, in 1922, it was held:

"A baker, in whose establishment the various processes are conducted by electrically driven machinery, is a 'manufacturer,' and exempt from a license tax, under Const. 1913, art. 229, though he bakes nothing but bread."

And, in State v. E. I. Young Co., 157 La. 845, 103 So. 186, in 1925, the decision in Lan-

asa's Case was quoted with approval, and it was held:

"A company making only special brands of cakes entirely by machinery, except icing and wrapping, *held* a 'manufacturer,' under Const. 1913, art. 229, and exempt from paying tax under Act No. 171 of 1898, § 6, and Act No. 233 of 1920, § 8."

Surely, these recent cases, Lanasa's Case and the E. I. Young Company's Case, which are not referred to in the prevailing opinion in the present case, cannot be reconciled with it, on the theory that boiled hams, sold to grocers for resale, are intended for more immediate consumption than bread and cakes, which are baked daily.

It does not appear to me that the decision in State v. Bemis Bro. Bag Co., 135 La. 397, 65 So. 554, that the making of burlap bags was *manufacturing*, was founded upon the idea that the bags had a *permanent* value far greater than the burlap bagging had. On the contrary, burlap bags are intended for immediate use, for the packing of rice, sugar, etc., and, as I understand, they are destroyed, or turned into kitchen rugs or saddle blankets after they have been used once as burlap bags. But, as burlap bags, they are intended for just as immediate consumption as paper bags are.

I concede that a restaurateur, or a cook in a restaurant, should not be classed as a manufacturer; but that is not altogether. because he produces only what is intended for immediate consumption; but it is because, in ordinary parlance, as well as in legislative language, we would never consider a restaurant to be a manufacturing establishment. Neither would we consider a public

service corporation, engaged in generating electricity and thereby operating the street railways and electric lights throughout the city, as in the case of State v. New Orleans Railway & Light Co., 116 La. 144, 40 So. 597, 7 Ann. Cas. 724, to be a *manufacturer*. The principal reason for the ruling in that case, however, was that, for more than twenty years, the Legislature had imposed a license tax on such corporations, and the legislative construction of the constitutional exemption of manufacturers was deemed to be entitled to great weight. All that that decision is cited for, as I understand, is to show that the use of machinery, great or small, does not ipso facto make one a manufacturer. That, of course, is conceded.

What I dissent from in this case is the ruling, as I understand it, that the criterion by which one is to be classed, either as a manufacturer or not a manufacturer, is the durability or the perishability of the product which he makes. Accordingly, if the Gardner & Jacob Company would not boil their hams, and thereby prepare them for consumption, the company's business would be that of a manufacturer.

I concede that it is not easy to reconcile all of the decisions classifying manufacturers, and those who are not manufacturers; but I do not believe that the difficulty can be overcome by adopting, as the criterion, the durability or perishability of the article that is produced. In fact I believe that boiled hams may be kept in a refrigerator as long as ice cream may be kept there, and I am sure that boiled hams are not any more ready for consumption than bread and cakes are.

For these reasons I respectfully dissent from the prevailing opinion in this case.