504 So.2d 844 (1987)
Lydia Harrison RYAN, William H. Harrison, Jr. Family Projecta Louisiana Partnership in Commendam, Shirley Harrison Hyde, Katherine L. Harrison and Richard Harrison
v.
The GRANDISON TRUST.
No. 86-C-1640.
Supreme Court of Louisiana.
April 6, 1987.
Rehearing Denied May 7, 1987.
*845 Harry B. Kelleher, Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, John M. McCollam, Marcel Garsaud, Jr., Gordon, Arata, McCollum, Stuart & Duplantis, New Orleans, for applicant.
Donald L. Peltier, Peltier & Peltier, Thibodaux, Gary A. Lee, Faris, Ellis, Cutrone & Gilmore, New Orleans, for respondent.
DIXON, Chief Justice.
This is a petitory action in which we address the application of res judicata principles to actions where one or more parties assert rights of ownership. Plaintiffs Harrisons filed suit for a declaratory judgment, and defendant The Grandison Trust asserted the peremptory exception of res judicata. The trial court sustained the exception and the court of appeal reversed and remanded. 490 So.2d 317 (La.App. 1st Cir.1986). We granted The Grandison Trust's application for writs.
The exception of res judicata was based on a petitory action filed in 1940 which arose in the following manner. On August 29, 1929 Joseph deFuentes Harrison purchased approximately 22,000 acres of marshland located within Townships 19 and 20 South, Range 23 East, Lafourche Parish, Louisiana. The vendor reserved the oil, gas and mineral rights on the land and subsequently transferred these rights on July 22, 1930 to defendant's ancestor in title, The Grandison Company. The Grandison Company granted a lease to Gulf Refining Company which drilled Gulf Grandison Well No. 1 on March 18, 1939, abandoning it on June 16, 1939. Gulf also drilled the Gulf Grandison Well No. 2 on August 23, 1939 and abandoned it on December 17, 1939.
On February 5, 1940 Joseph Harrison sued the Grandison Company for slandering the title to his property by asserting ownership of the oil, gas and mineral rights. Joseph Harrison claimed that the mineral servitude had terminated by the accrual of the ten year liberative prescription of nonuse from August 28, 1929 to August 28, 1939 on a tract of land which *846 allegedly was noncontiguous to any tract with a producing well. Joseph Harrison contended that the noncontiguous area was separated from the balance of the servitude by intervening navigable waterways, and that state ownership of the beds of these navigable bodies separated the lands, creating separate and distinct servitudes. Before filing suit, Joseph Harrison sold small portions of his property to others, but none joined him as plaintiffs in the lawsuit. Joseph Harrison later died and his widow and children were substituted as plaintiffs.
The Grandison Company filed a motion to remand based on the amount in controversy, but the motion was denied. The Grandison Company then removed the suit to federal court and converted it into a petitory action. In the posture of plaintiff in the petitory action, The Grandison Company asserted its ownership of all portions of the servitude on lands adjoining and contiguous to the tracts on which were drilled Gulf Grandison Well No. 1 and Well No. 2. Before trial, the parties stipulated, among other agreements, that the lands involved were all granted by the United States to the State of Louisiana under the Swamp Land Act of 1849, and were patented by the state in 1901 to Joseph Harrison's predecessors in title as sea marsh or prairie lands. It was also agreed that the Gulf Grandison Well No. 1 and Well No. 2 were drilled in a diligent and bona fide effort to bring in production, down to a depth which, considering the wells' locations, was the depth where one could reasonably expect that oil, gas and other minerals would be produced in paying quantities. During trial The Grandison Company admitted that not all of the Harrison lands were contiguous to each other, and that, as to such tracts The Grandison Company specifically admitted to be noncontiguous to the well site, the drilling of Gulf Grandsion Wells Nos. 1 and 2 respectively did not interrupt the running of the ten year prescription for nonuse. A stipulation setting out exactly what landed area was claimed by The Grandison Company to be still affected by the August 28, 1929 mineral rights reservation was filed into the record, including a map and sketch by John C. deArmas, Jr., C.E.
Judge Caillouet of the federal district court fully considered and rejected Joseph Harrison's claim that state-owned beds of navigable waterways divided the tract and the servitude. The court concluded that the lands designated in its judgment as included in "Tract A" were contiguous to each other and only one servitude existed on the tract due to the absence of any separating navigable waterways with state-owned beds:
"All of the plaintiff's evidence relating to the question of navigability vel non, just adverted to, found its way into the record over and subject to defendant's objection; but even if fullest possible benefit therefrom be made available to support plaintiff's contention, due consideration and weighing of all the evidence, oral and documentary, and ordinary and expert testimony, leads to the definite conclusion that none of plaintiff's contentions is established by the preponderance of evidence, but that, on the contrary, defendant has satisfactorily proved, by the presumptively valid and conclusive patent coverage demonstrated, the complete absence (from the hatched area relating to the Grandison No. 1 drilling operations) of any separating State-owned water beds and the existence of the claimed continuity and contiguity of the Harrison lands (bearing from the Grandison No. 1 well-site) necessary to prevent the consummation of the ten-year nonuser prescription as to any part of the hatched area on the deArmas sketch, except the admittedly segregated tract in T. 20 S., R. 23 E. (composed, in greater part, of portions of Sections 21 and 28) whereon was drilled the Grandison No. 2 well." Harrison v. Grandison Company, 51 F.Supp. 768, 774 (E.D.La. 1943).
In the judgment, Judge Caillouet found that the area at issue was composed of two separate tracts of land, designated as Tract A and Tract B, and a separate servitude *847 existed on each tract.[1] The court ruled that as both servitudes had been exercised repsectively by the drilling of Gulf Grandison Well No. 1 on Tract A and Gulf Grandison Well No. 2 on Tract B within the ten years from the initial oil, gas and mineral reservation, The Grandison Company was the owner of the oil, gas and mineral rights on these two tracts. Judge Caillouet further settled the ownership question in this *848 petitory action by rendering partial judgment in favor of Joseph Harrison's heirs, decreeing that all of the oil, gas and mineral rights appertaining to the portions of land not included in Tract A or Tract B had reverted to the surface owner by virtue of ten years nonuse dating from August 29, 1929. This judgment was never appealed and became final. Harrison v. Grandison Company, 51 F.Supp. 768 (E.D.La.1943).
On January 22, 1949 the H.L. Hunt Well No. 1 was drilled on Tract A. This was the only well drilled on Tract A after Gulf Grandison Well No. 1 was abandoned in 1939. No wells were drilled on Tract B after Gulf Grandison Well No. 2 was abandoned in 1939, and it was admitted that the servitude burdening Tract B expired in 1949 due to the accrual of the prescriptive period of ten years nonuse. After the federal court decision, the Harrison family reacquired a tract of land previously sold, and in 1966 The Grandison Company transferred its rights in the lands to The Grandison Trust.
On February 11, 1982 Lydia Harrison Ryan, William H. Harrison, Jr., Shirley Harrison Hyde, Katherine L. Harrison, Richardson Harrison and Family Project-A Louisiana Partnership in Commendam (hereinafter "Harrisons") filed the present suit against The Grandison Trust (hereinafter "Grandison") seeking a declaratory judgment that almost all the oil, gas and mineral rights on Tract A held by Grandison had reverted to them by virtue of the accruing in 1949 of ten years prescription of nonuse. The Harrisons exempted a limited area immediately adjacent to the H.L. Hunt No. 1 well site from the scope of their petition, claiming that the well interrupted the running of prescription on this small area only. The Harrisons claimed that the two bayous bordering the Hunt well area were navigable on or before January 22, 1949, the date the well was drilled. State ownership of the beds of these navigable waterways allegedly separated the Hunt well tract from the remainder of Tract A, creating two separate and distinct servitudes. Therefore, the Harrisons argued that mineral rights on Tract A lands lying beyond the two bayous surrounding the Hunt well site reverted to them as surface owners by virtue of the accrual of ten years prescription of nonuse on June 17, 1949, ten years after Gulf Grandison Well No. 1 was abandoned. The Harrisons asserted in the alternative the running of prescription on two other portions of Tract A allegedly separated by navigable waterways from the well site area.
Believing the identical juridical fact of noncontiguity had been adjudicated in the previous federal action, defendant Grandison filed an exception of res judicata, exempting from its plea the land sold by Joseph Harrison prior to the 1940 suit. The trial court severed the claim on these previously sold lands from the Harrisons' main demand, and sustained Grandison's exception, finding the cause asserted in both actions to be the noncontiguity of the servitude because of intervening state ownership of the beds of certain allegedly navigable waterways. The trial court reiterated the principle that in petitory actions, res judicata prevents litigation of causes which the parties could have pleaded in the earlier suit. The court of appeal reversed and remanded on grounds that there was neither identity of thing demanded nor identity of cause in the two actions, and held that as the issue of navigability subsequent to 1943 was not present in the earlier action, it could not be the subject of a res judicata plea. Ryan v. The Grandison Trust, supra. We granted writs to determine the applicability of res judicata in this petitory action.
The essential elements of res judicata in our civilian system are stated in R.S. 13:4231 (redesignated as R.S. 13:4231 from former Civil Code article 2286 by Acts 1984, No. 331, § 7, eff. January 1, 1985):
"The authority of the thing adjudged takes place only with respect to what was the object of the judgment. The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be between the same parties, and formed by them against each other in the same quality."
*849 The theory of civilian res judicata is that matters actually litigated and finally adjudged are presumed correct and thus should not be contradicted in a subsequent suit. Dixon, Booksh and Zimmering, "Res Judicata in Louisiana since Hope v. Madison," 51 Tul.L.Rev. 611, 617 (1977).
The general civil law rule that res judicata precludes relitigation of only causes actually pleaded and decided in the prior case is inapplicable in certain types of litigation. The desire to eliminate vexatious suits, combined with unique factual situations appearing in certain types of disputes, has led to the creation of exceptions to the rule. Some exceptions have evolved jurisprudentially and others legislatively, but whatever their source, where exceptions are applied, relitigation of issues is precluded even though not all of the requirements of the civilian doctrine of res judicata have been satisfied. Exceptions include petitory actions where parties are claiming ownership interests, suits on a single tort giving rise to one cause of action which cannot be divided, suits for injunctive relief, and suits in which a judicial determination of fault in a separation or divorce proceeding has been made. Hope v. Madison, 194 La. 337, 193 So. 666 (1940); 51 Tul.L.Rev. 611, 638-641.
In petitory actions, res judicata precludes relitigation of not only causes which were pleaded and decided in the prior case, but also causes which the party could have pleaded. A party must plead whatever title or defense may be at his command or within his knowledge at the time of the first suit or be precluded from asserting it in a subsequent suit to determine ownership. Brown Land & Royalty Co. v. Pickett, 226 La. 88, 75 So.2d 18 (1954). See Hope v. Madison, supra; Succession of Whitner, 165 La. 769, 116 So. 180 (1928); Gajan v. Patout & Burguieres, 135 La. 156, 65 So. 17 (1914); Lindquist v. Maurepas Land & Lumber Co., 112 La. 1030, 36 So. 843 (1904); Howcott v. Pettit, 106 La. 530, 31 So. 61 (1901); Heirs of Brigot v. Brigot, 49 La.Ann. 1428, 22 So. 641 (1897) and Shaffer v. Scuddy, 14 La.Ann. 575 (1859). See also "Res Judicata'Matters Which Might Have Been Pleaded,'" 2 La.L. Rev. 347, 498, fn. 32 (1940). In Hope v. Madison, supra, this court defined the petitory exception to the general res judicata rule as follows:
"(3) that parties litigant in a petitory action, whether plaintiff or defendant, must set up whatever title or defense they may have at their command or a judgment on that issue will bar a second action based on a right or claim which existed at the time of the first suit, even though omitted therefrom...." Hope v. Madison, supra 194 La. at 343, 193 So. at 668.
This exception is predicated upon the necessity of protecting and insuring stability and security of title, preventing undue hardship or fraud with respect to rights of innocent third party purchasers, and obviating unnecessary successive litigation. Brown Land & Royalty Co. v. Pickett, supra and 51 Tul.L.Rev. 611, 639.
In the instant case, the identity of the parties is not disputed. However, the Harrisons do contest the presence of identity in the thing demanded, contending that the thing demanded in the prior federal action was the recognition of reversionary rights accruing in 1939, whereas the present thing demanded is the recognition of reversionary rights accruing in 1949. Grandison asserts that the thing demanded in both suits is the extinguishment of the mineral servitude burdening Tract A. The trial court found identity in the thing demanded and we agree. The "thing demanded" has been defined as the "kind of relief sought." Quarles v. Lewis, 226 La. 76, 75 So.2d 14 (1954), overruled on other grounds, 367 So.2d 6 (La.1978). Both the federal action and the present action were petitory actions, and the kind of relief sought was the right of ownership of the oil, gas and mineral rights on the land in question. In Scurlock Oil Co. v. Getty Oil Co., 294 So.2d 810 (La.1974), the court found an identity in thing demanded because each suit sought cancellation and termination of identical leases obtained by the lessee from the landowners at approximately the same time. Each suit sought a decree declaring the same leases to be invalid *850 and an order for their cancellation. Likewise, here, each suit sought a decree declaring the mineral servitude to be extinguished. The same mineral servitude is at issue, just as the same leases were at issue in Scurlock. The ultimate object of each suit in Scurlock was to obtain the funds on deposit derived from production attributable to the same properties. In this case, the ultimate object of each suit was to seek the same mineral rights attributable to the same properties.
In disagreeing with the trial court on identity of thing demanded, the court of appeal quoted State v. American Sugar Refining Co., 108 La. 603, 612, 32 So. 965, 968-969 (1902), a case involving a tax for different years under the same contentions and defenses:
"The demands for taxes for different years may be as near alike as two peas, but they are not identical. The identity would be in the defense, but the defense is only a reason for judgment, and forms no part of the judgment."
The court of appeal analogized American Sugar to the instant case, concluding that while the defenses may be identical, the things demanded are different due to the accrual of two different periods of prescription, and hence res judicata does not apply. American Sugar is distinguishable from the instant case, a petitory action. Grandison is a petitory plaintiff and as such its "defense" of ownership due to contiguity of the tract has the force of a demand for res judicata purposes. Justice Provosty in American Sugar recognized this distinction, stating:
"... If, ... instead of confining myself to denial of plaintiff's claim, I set up an independent right, justifying my conduct, as that I am owner of the fence in question, or that I have by contract the right to break said fence, then, as a matter of course, as to this defense, if again set up in the second suit, there would be res judicata; but the reason would be that, while urged as a defense, this claim of right would in reality be a demand brought by way of reconvention. I should, pro hac vice, have ceased to be defendant and become plaintiff; and the necessary feature of identity of demand in the two suits would be presented...." 108 La. at 613, 32 So. at 969.
As in Justice Provosty's example, the claim or right brought by reconvention is ownership of the oil, gas and mineral rights by extinction of the servitude, and the thing demanded in the prior action and the present is the same.
R.S. 13:4231 also requires identity in the cause of action before res judicata will apply. It is well accepted that the phrase "cause of action" resulted from a misunderstanding of the French word "cause" used in the Civil Code of 1808; the French word "cause" does not mean the same thing as the English phrase "cause of action." In Mitchell v. Bertolla, 340 So.2d 287 (La.1976), this court equated "cause" with the juridical or material fact which is the basis of the right claimed, or the defense pleaded. See also "Res Judicata `Matters Which Might Have Been Pleaded,' " 2 La.L.Rev. 347, 355 (1940). "Cause is the principle upon which a specific demand is grounded while cause of action embraces the cause and the demand, and is related to the party making the demand." Mitchell v. Bertolla, supra at 291, quoting Maloney, "Preclusion Devices in Louisiana: Collateral Estoppel," 35 La.L.Rev. at 165, note 41. The juridical fact or "cause" of the 1943 suit was the assertion that the servitude had been extinguished due to the noncontiguity of certain lands to an area with a working well. Noncontiguity was the basis of the right claimed in that only if the tract at issue was noncontiguous to the well site would prescription have accrued and the servitude extinguished. The juridical fact at issue in the present suit is the same: the extinguishment of the servitude due to the noncontiguity of certain lands to an area with a working well. In the 1943 action, noncontiguity of the tract burdened by a servitude to an area with a working well was considered and dismissed as the federal court found that no navigable waterways existed to divide the servitude. The federal judge ruled that the waterways on Tract A were not navigable.
*851 Both the 1943 suit and the 1982 suit concern ownership of the oil, gas and mineral rights on Tract A. Because the 1943 suit was converted into a petitory action, neither the Harrisons nor Grandison can plead any claim of ownership to these rights that was available in 1943. Any claim to ownership that existed in 1943 is precluded by res judicata from being asserted at this time, including noncontiguity of the tract due to intervening navigable waterways. However, the Harrisons include in their petition the assertion that certain waterways on Tract A were navigable "on or before January 22, 1949." As the prior suit was decided in 1943, the claim of navigability arising after 1943 but before or on January 22, 1949 was nonexistent and could not be pleaded or decided. Since res judicata in petitory actions precludes only claims existing at the time of the initial action, the Harrisons' subsequent navigability claim is not barred at this time, and the exception of res judicata does not lie as to this one narrow issue only. All other claims of navigability of the waterways arising before 1943 are barred.
The Harrisons' assertion of subsequent navigability raises the question of the effect of navigability on the servitude. The federal court did not reach the "effect" issue, pretermitting it by finding the waterways nonnavigable and the beds, therefore, not owned by the state. We, too, do not reach the issue of effect at this time.[2]
The Harrisons also argue that noncontiguity was only a reason for judgment and res judicata does not take place with respect to the reasons for judgment, citing among other cases State v. American Sugar Refining Co., supra. As previously discussed, American Sugar was not a petitory action and res judicata in petitory actions is broader than the general rule. Noncontiguity before 1943 is a claim that must have been asserted in the original suit to determine ownership, and cannot be relitigated under the doctrine of res judicata.
For reasons stated herein, we affirm the court of appeal only as to the narrow issue of subsequent navigability arising after the date of the federal court judgment in 1943 and its effect on the contiguity of Tract A. We reverse the court of appeal and reinstate the trial court's ruling sustaining the exception of res judicata on all other claims, at the cost of relators.
LEMMON, J., concurs in the result.
NOTES
[1] In his judgment Judge Caillouet designated as "Tract A" the following portions of land:

"A certain tract of land south of Little Lake in Township 19 South, Range 23 East, and Township 20 South, Range 23 East, West of the Mississippi River, in Lafourche Parish, Louisiana, and more fully described as follows:
All of fractional Section 3, except that portion in Southeast corner south of Coffee Bay arm.
All of fractional Section 4.
All of Section 9 except the west half of the southwest quarter.
All of fractional Section 10 west and south of Coffee Bayou and Coffee Bay.
That portion of Section 11 south of Coffee Bayou.
That portion of Section 12 south of Coffee Bayou and Manila Bayou and West of the bayou connecting Snail Bayou and Manila Bayou.
All of fractional Section 13 except that part in the northeast quarter north of Snail Bayou, and except that part in the Northwest quarter north of Manila Bayou.
All of Section 14 except the northwest quarter of the southwest quarter and the south half of the southwest quarter and the southwest quarter of the southeast quarter.
All of Section 15 except the north half of the south half.
The north half of the north half, the southeast quarter of the northeast quarter and the southeast quarter of Section 21.
All of Section 22.
All of Section 23.
All of Section 24.
All of Section 25.
All of Section 26.
All of Section 27.
The east half of Section 28.
The east half of Section 33.
All of fractional Section 34 except the island in Lake Enfermer (Renfermer).
All of Section 35.
All of Section 36.
The following described portion of said tract "A" is situated in Township 20 South, Range 23 East:
All of Section 1 west of Snake Bayou and the small unnamed connecting bayou leading northeasterly across the section.
All of fractional Section 2.
All of fractional Section 3 except that portion of the island in Lake Enfermer (Renfermer) situated within the northern part of said section.
All of fractional Section 4 except that part southwest of Round Lake and Palmetto Bayou.
Section 9Fractional part of the northeast quarter of Section 9, north of Palmetto Bayou.
All of fractional Section 10 except that part southwest of Palmetto Bayou.
All of fractional Section 11 except that part in southwest quarter bounded on the north, east and west by an unnamed bayou connecting Bay L'Ourse and Oak's Bay.
All of fractional Section 12 except that part lying east of Snake Bayou, and small area in Southeast quarter south of unnamed bayou leading to Hatchet Lake from Bayou (sic) L'Ourse.
The portion of fractional Section 13 north of Bay L'Ourse and north of unnamed bayou leading to Hatchet Lake from Bay L'Ourse.
Section 14Fractional northeast quarter of Section 14 lying north and east of Bay L'Ourse, and that portion of the west half of fractional Section 14 lying north of Oak's Bay and lying north and west of small unnamed bayou leading from Oak's Bay.
Section 15All that portion of fractional Section 15 lying north and east of Palmetto Bayou."
The following portions of land were designated as "Tract B":
"A certain tract of land south of Little Lake in township 20 South, Range 23 East, west of the Mississippi River, in Lafourche Parish, Louisiana, and more fully described as follows:
All of fractional Section 21 except that part lying southwest of unnamed bayou leading from Bay Vasier.
Section 22All of fractional southwest quarter of the southwest quarter lying south and west of the small unnamed bayou leading from Bay Vasier to Bay Rombo.
Section 27That part of the fractional northwest quarter of the northwest quarter of Section 27 lying north of Bay Vasier and west of small bayou leading from Bay Vasier to Bay Rombo. Section 27The fractional southwest quarter of the southwest quarter of Section 27 lying west of Bay Vasier.
Section 28That portion of fractional Section 28 on the west side of Bay Vasier and north of the arm leading northwest from Bay Vasier and east of unnamed bayou leading northerly from aforementioned arm of Bay Vasier.
Section 33The fractional northeast quarter of the northeast quarter.
Section 34The fractional northwest quarter of the northwest quarter of Section 34."
These two tracts were fully shown and delineated by hatched lines (with the exception of the island in Lake Enfermer, or Renfermer) on a map entitled "Map showing land claimed by The Grandison Company, Townships 19 and 20 South, Range 23 East, west of the River, Lafourche Parish, Louisiana, January, 1942, John C. deArmas, Jr., C.E." The deArmas map and sketch were stipulated to by the parties and incorporated into Judge Caillouet's judgment to insure greater certainty of description.
[2] While the change in navigability status of the waterways after 1943 is not barred from being litigated, its determination may be irrelevant to the ultimate issue of ownership. Since this issue is not before us at this time, we can only theorize that such a change in navigability status would not divide the servitude and render some tracts noncontiguous from others in Tract A nor automatically vest ownership of the beds in the state based on current law. See Civil Code art. 652; R.S. 9:1151; R.S. 31:62, 65; La. Const. of 1974, Art. 1, § 4.